Docket No. 107328.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

PROVENA COVENANT MEDICAL CENTER *et al.,* Appellants, v. THE DEPARTMENT OF REVENUE *et al.,* Appellees.

*Opinion filed March 18, 2010.*

JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justice Thomas concurred in the judgment and opinion.

Justice Burke concurred in part and dissented in part, with opinion, joined by Justice Freeman.

Justices Kilbride and Garman took no part in the decision.

## OPINION

The central issue in this case is whether Provena Hospitals established that it was entitled to a charitable exemption under section 15–65 of the Property Tax Code (35 ILCS 200/15–65 (West 2002)) for the 2002 tax year for various parcels of real estate it owns in Urbana. The Director of Revenue determined that it had not and denied the exemption. Provena Hospitals then filed a complaint for administrative review in the circuit court of Sangamon County. Following a hearing, the circuit court determined that Provena Hospitals was entitled to both a charitable and religious exemption (35 ILCS 200/15–40(a)(1) (West 2002)). The Department of Revenue appealed. The appellate court found the Department's arguments to

be meritorious and reversed the judgment of the circuit court. 384 Ill. App. 3d 734. We granted Provena Hospitals' petition for leave to appeal. 210 Ill. 2d R. 315. We subsequently allowed the American Hospital Association, the Illinois Hospital Association, and the Catholic Health Association of the United States and related organizations to file friend of the court briefs in support of Provena Hospitals. We also granted leave to the Center for Tax and Budget Accountability and the Legal Assistance Foundation of Metropolitan Chicago to file friend of the court briefs in support of the Department of Revenue. For the reasons that follow, we now affirm the judgment of the appellate court upholding the decision by the Department of Revenue to deny the exemption.

BACKGROUND

The appellant property owner and taxpayer in this case is Provena Hospitals. Provena Hospitals is one of four subsidiaries of Provena Health, a corporation created when the Servants of the Holy Heart and two other groups affiliated with the Roman Catholic Church merged their health-care operations.[1] Provena Hospitals was formed through the consolidation of four Catholic-related health-care organizations and is organized as a not-for-profit corporation under the laws of Illinois. The articles of consolidation for Provena Hospitals state that the purpose of the corporation is to "coordinate the activities of Provena Hospitals' subsidiaries or other organizations that are affiliated with Provena Hospitals as they pursue their religious, charitable, educational and scientific purposes" and "to offer at all times high quality and cost effective healthcare and human services to the consuming public."

Provena Hospitals is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code (26 U.S.C. §501(c)(3)

---

[1]According to Provena Health's table of organization, its other three units are Provena Senior Services, which operates numerous nursing homes and adult care facilities; Provena Home Care; and Provena Ventures, which consists of Provena Properties and Provena Enterprises. Provena Enterprises, in turn, is comprised of Medicentre Laboratories and Bennett Operating Company.

(1988)). The Illinois Department of Revenue has also determined that the corporation is exempt from this state's retailers' occupation tax (see 35 ILCS 120/1 *et seq.* (West 2002)), service occupation tax (see 35 ILCS 115/1 *et seq.* (West 2002)), use tax (see 35 ILCS 105/1 *et seq.* (West 2002)), and service use tax (see 35 ILCS 110/1 *et seq.* (West 2002)). In addition, the Illinois Attorney General has concluded that the corporation "meets the qualifications of Section 3(a) of 'An Act to Regulate Solicitation and Collection of Funds for Charitable Purposes' [225 ILCS 460/3(a) (West 2002)] and Section 4 of 'The Charitable Trust Act' [760 ILCS 55/1 (West 2002)]" and constitutes a religious organization exempt from filing annual financial reports under those statutes.

Provena Hospitals owns and operates six hospitals, including Provena Covenant Medical Center (PCMC), a full-service hospital located in the City of Urbana. PCMC was created through the merger of Burnham City Hospital and Mercy Hospital. It is one of two general acute care hospitals in Champaign/Urbana and serves a 13-county area in east central Illinois. The services it provides include a 24-hour emergency department; a birthing center; intensive care, neonatal intensive care, and pediatrics units; surgical, cardiac care, cancer treatment, rehabilitation and behavioral health services; and home health care, including hospice. It offers case management services to assist older persons to remain in their homes and runs various support groups and health-related classes. It also provides smoking cessation clinics and screening programs for high cholesterol and blood pressure as well as pastoral care.

PCMC maintains between 260 and 268 licensed beds. Each year it admits approximately "10,000 inpatients and 100,000 outpatients." Some 60% of its inpatient admissions originate through the hospital's emergency room, which treats some 27,000 visitors annually.

PCMC provides an emergency department because it is required to do so by the Hospital Emergency Service Act (210 ILCS 80/0.01 *et seq.* (West 2002)). Where emergency room services are offered, a certain level of health care is required to be provided to every person who seeks treatment there. That is so as a matter of both state (210 ILCS 80/1 (West 2002); see also 210 ILCS 70/1 (West 2002)) and federal (42 U.S.C. §1395dd) law.

Staffing PCMC are approximately 1,000 employees, 400

volunteers and 200 physicians. The physicians are not employed or paid by the hospital. They are merely credentialed to provide services there in exchange for paying $50 per year in dues to the hospital's library fund, and agreeing to serve on hospital committees and to be on call to attend patients without their own physicians. With respect to the emergency department, PCMC contracts with a for-profit private company to provide the necessary physicians. The company, not the hospital, bills patients and any third-party payors directly for emergency room services. The company likewise pursues payment of those bills independently from PCMC.

Just as PCMC relies on private physicians to fill its medical staff, it utilizes numerous third-party providers to furnish other services at the hospital. Among these are pharmacy, laundry, MRI/CT and lab services, and staffing for the rehabilitation and cardiovascular surgery programs. The company providing lab services is one of the businesses owned by Provena Enterprises, a Provena Health subsidiary. It is operated for profit.

Provena Hospitals' employees do not work gratuitously. Everyone employed by the corporation, including those with religious affiliations, are paid for their services. Compensation rates for senior executives are reviewed annually and compared against national surveys. Provena Health "has targeted the 75th percentile of the market for senior executive total cash compensation."

According to the record, PCMC's inpatient admissions encompass three broad categories of patients: those who have private health insurance, those who are on Medicare or Medicaid, and those who are "self pay (uninsured)." PCMC has agreements with some private third-party payers which provide for payment at rates different from "its established rates." The payment amounts under these agreements cover the actual costs of care. The amounts PCMC receives from Medicare and Medicaid are not sufficient to cover the costs of care. Although PCMC has the right to collect a certain portion of the charges directly from Medicare and Medicaid patients and has exercised that right, there is still a gap between the amount of payments received and the costs of care for such patients. For 2002, PCMC calculated the difference to be $7,418,150 in the case of Medicare patients and $3,105,217 for Medicaid patients.

PCMC was not required to participate in the Medicare and

-4-

Medicaid programs, but did so because it believed participation was "consistent with its mission." Participation was also necessary in order for Provena Hospitals to qualify for tax exemption under federal law. In addition, it provided the institution with a steady revenue stream.

During 2002, Provena Hospitals' "net patient service revenue" was $713,911,000, representing approximately 96.5% of the corporation's total revenue. No findings were made regarding the precise source of the remainder of its revenue. Provena Hospitals' "expenses and losses" exceeded its "revenue and gains" during this period by $4,869,000. In other words, the corporation was in the red. The following year, this changed. The corporation's revenue and gains exceeded its expenses and losses by $10,548,000.

Of Provena Hospitals' "net patient service revenue" for 2002, $113,494,000, or approximately 16%, was generated by PCMC. Unlike its parent, PCMC realized a net gain of income over "expenses and losses" of $2,165,388 for that year. This surplus existed even after provision for uncollectible accounts receivable (*i.e.*, bad debt) in the amount of $7,101,000. Virtually none of PCMC's income was derived from charitable contributions. The dollar amount of "unrestricted donations" received by PCMC for the year ending Dec. 31, 2002, was a mere $6,938.

PCMC experienced a modest net loss in 2003. The record discloses, however, that Provena Hospitals' auditors showed accrued property tax liabilities in the amount of $1.1 million per year for both 2002 and 2003 in the accounts payable and accrued expenses portions of the 2003 balance sheet. Had only the 2003 property tax been posted against the revenue and gains for 2003, that year would also have shown a net gain for PCMC.

In years when PCMC realizes a net gain, the gain is "reinvested in order to sustain and further [the corporation's] charitable mission and ministry." No findings were made regarding how much of the reinvestment occurs at PCMC and how much is allocated to other aspects of Provena Hospitals' operations. Nor were specific findings made regarding the particular purposes to which the reinvested funds were put. The record indicates, however, that PCMC "generally needs approximately two to four million dollars in margin each year to replace broken items and fix non-operating equipment."

In 2002, PCMC budgeted $813,694 for advertising and advertised in newspapers, phone directories, event playbills, and Chamber of Commerce publications; on television and radio; and through public signage. Its also advertised using "booths, tables, and/or tents at community health or nonprofit fundraising events; sponsorship of sports teams and other community events; and banner advertisements at sponsored community events." The ads taken out by PCMC in 2002 covered a variety of matters, including employee want ads. None of its ads that year mentioned free or discounted medical care.[2]

While not mentioned in PCMC's advertisements, a charity care policy was in place at the hospital, and the parties stipulated that PCMC's staff made "outreach efforts to communicate the availability of charity care and other assistance to patients." The charity care policy, which was shared with at least one other hospital under Provena Hospitals' auspices, provided that the institution would "offer, to the extent that it is financially able, admission for care or treatment, and the use of the hospital facilities and services regardless of race, color, creed, sex, national origin, ancestry or ability to pay for these services."[3]

The charity policy was not self-executing. An application was required. Whether an application would be granted was determined by PCMC on a case-by-case basis using eligibility criteria based on federal poverty guidelines. A sliding scale was employed. Persons whose income was below the guidelines were eligible for "a 100%

---

[2]In subsequent years, Provena Hospitals altered its advertisements and increased its efforts to communicate the availability of charity care to patients. The case before us is concerned only with the situation as of 2002. With respect to that time period, the Director of Revenue bluntly concluded that "the record does not show that [PCMC] made any material effort to publicize the availability of charity care to those who were most in need of it."

[3]Of course, to the extent this policy addresses racial and other forms of noneconomic discrimination, it does not concern "charity" at all as we use that term today. Treating all persons equally regardless of such factors as race, religion or gender is no longer considered a matter of grace. In most situations, it is a legal requirement.

reduction from the patient portion of the billed charges." Persons whose income was not more than 125% of the guidelines could qualify for a 75% reduction. With an income level not more than 150% of the guidelines the discount fell to 50%. At an income level not more than 200% of the guidelines, the potential reduction was 25%.[4] Eligibility was also affected by the value of an applicant's assets. Patients who qualified based on low income might nevertheless be rendered ineligible if the equity in their principal residence exceeded $10,000 or they held other assets valued at more than $5,000.

PCMC's policy specified that the hospital would give a charity care application to anyone who requested one, but it was the patient's responsibility to provide all the information necessary to verify income level and other requested information. To verify income, a patient was required to present documentation "such as check stubs, income tax returns, and bank statements."

PCMC believed that its charity care program should be the payer of last resort. It encouraged patients to apply for charity care before receiving services, and if a patient failed to obtain an advance determination of eligibility under the program, normal collection practices were followed. PCMC would look first to private insurance, if there was any; then pursue any possible sources of reimbursement from the government. Failing that, the hospital would seek payment from the patient directly.

Short-term collection matters were handled by Provena Hospitals' "Extended Business Office." Staffed by a small group of employees in Joliet, the Extended Business Office would typically make three or four phone calls and send three or four statements to patients owing outstanding balances.[5] If a balance remained unpaid following such

---

[4]Uninsured patients appear to have been billed for services at PCMC's full "established" rates. Using Provena Hospitals' figures, its actual cost of service was only about 47% of the price it charged such patients. As a result, the corporation could still garner a surplus in cases where it conferred discounts at the 25% and 50% levels.

[5]Provena Hospitals' explanation for utilizing collection agencies was that its own financial system "[did] not have a mechanism for sending

efforts, which typically did not extend beyond three months, Provena Hospitals would treat the account as "bad debt" and refer it to a collection agency. From time to time, the collection agencies would seek and were given authorization to pursue legal action against an account "on which, over the course of several months, the agency had not received any response, cooperation or payment from the patient." Provena Hospitals' decision as to whether to pursue legal action against a patient depended on review of the particular account. During 2002, it did not have a blanket policy requiring referral to a collection attorney in every case.

The fact that a patient's account had been referred to collection did not disqualify the patient from applying to the charity care program. Applications would be considered "[a]t any time during the collection process." PCMC had financial counselors to assist patients with paying outstanding balances and review all payment options with them. The counselors helped patients seek and qualify for financial assistance from other sources. Where a patient was given an application for charity care but failed to return it, the counselors would send letters and call the patients to remind them to do so.

During 2002, the amount of aid provided by Provena Hospitals to PCMC patients under the facility's charity care program was modest. The hospital waived $1,758,940 in charges, representing an actual cost to it of only $831,724. This was equivalent to only 0.723% of PCMC's revenues for that year and was $268,276 less than the $1.1 million in tax benefits which Provena stood to receive if its claim for a property tax exemption were granted.[6]

The number of patients benefitting from the charitable care program was similarly small. During 2002, only 302 of PCMC's

---

statements to patients on a long-term basis."

[6]The disparity between the amount of free or discounted care dispensed and the amount of property tax that would be saved through receipt of a charitable exemption is in no way unique to the case before us here. Excluding bad debt, "the amount of uncompensated care provided by as many as three-quarters of nonprofit hospitals is less than their tax benefits." J. Colombo, *Federal and State Tax Exemption Policy, Medical Debt and Healthcare for the Poor*, 51 St. Louis L.J. 433, 433 n.2 (2007).

10,000 inpatient and 100,000 outpatient admissions were granted reductions in their bills under the charitable care program. That figure is equivalent to just 0.27% of the hospital's total annual patient census.

The PCMC complex is comprised of 43 separate real estate parcels. The main PCMC hospital building consists of parcels bearing the parcel identification numbers 91-21-07-404-001 through 91-21-07-404-010 and measures 395,685 square feet. Of this, 795 square feet (0.2% of the total) are used for the outpatient pharmacy; 1,592 square feet (0.4%) are devoted to the gift shop; 3,933 square feet (0.99%) are leased to the Board of Trustees of the University of Illinois; and 9,319 square feet (2.4%) are occupied by the hospital's emergency department. An additional 22,065 square feet (5.6%) is leased to for-profit entities or otherwise used for purposes which, the parties agree, render the space ineligible for any real estate tax exemption.

In addition to the main hospital building, the PCMC complex includes a parking garage, which consists of parcels numbered 91-21-07-408-001 through 91-21-07-408-011; a cancer center, consisting of parcels 91-21-07-403-006 through 91-21-07-403-009; the cancer center's parking lot, which includes parcels 91-21-07-403-001 through 91-21-07-403-005; the Crisis Nursery of Champaign/Urbana, which occupies parcels 91-21-07-407-001 through 91-21-07-407-003; and the Crisis Center's parking lot, situated on parcel 91-21-07-407-004. The complex also includes six additional parking lots: B, which is on parcel 46-21-07-336-001; C, which consists of parcel 46-21-07-338-006; D, which is located on parcel 46-21-07-337-006; E, which is on a parcel identified as 91-21-07-408-012; H, which includes parcels numbered 46-21-07-336-002 and 46-21-07-336-003; and a lot for PCMS employees covering parcels 91-21-07-409-18, 91-21-07-409-19, and 91-21-07-409-23.

Provena Hospitals applied to the Champaign County board of review to exempt all 43 of the parcels in the PCMC complex from property taxes for 2002. Exemption was requested under section 15–65(a) of the Property Tax Code (35 ILCS 200/15–65(a) (West 2002)) on the grounds that the parcels were owned by an institution of public charity and that the property was "actually and exclusively used for charitable or beneficent purposes, and not leased or

otherwise used with a view to profit." The board of review recommended this application be denied. The Illinois Department of Revenue agreed and denied the application in February of 2004, ruling that the property "was not in exempt ownership" and "not in exempt use."

As suggested earlier in this opinion, the tax to which the disputed property was subject totaled approximately $1.1 million. In March of 2004, PCMC paid that sum, under protest, to the treasurer of Champaign County.[7] It then filed a timely petition for a hearing on the exemption decision pursuant to section 8–35(b) of the Property Tax Code (35 ILCS 200/8–35(b) (West 2002)). The parties subsequently realized that because PCMC itself is not a legal "person," the exemption request should be treated as if it had been submitted by Provena Hospitals, which holds title to the 43 parcels at issue here. Because the parties agree that Provena Hospitals is the proper party to seek the exemption, we shall consider it to be the true applicant, as did the appellate court. 384 Ill. App. 3d 734.

In requesting a hearing on denial of the exemption, counsel for Provena Hospitals asserted that it could provide "clear evidence that it is a charitable organization entitled to charitable exemptions for the subject properties in accordance with section 15–65 of the Property Tax Code (35 ILCS 200/15–65 (West 2002)), Illinois case law and exemption determinations made by [the Department of Revenue] for other charitable institutions." Initially, no claim was made that any of the 43 subject properties might also qualify for exemption under section 15–40 of the Property Tax Code (35 ILCS 200/15–40 (West 2002)), which pertains to property used exclusively for "religious purposes," "school and religious purposes," or "orphanages," or that they might be exempt from property tax under any other provision of Illinois law. Later in the proceedings, however, Provena Hospitals asserted that the evidence "also conclusively establishes that [the] property also qualifies for exemption based on religious use."

---

[7]Provena Hospitals subsequently managed to obtain a refund of the tax pending this appeal. The propriety of that refund is the subject of a separate appeal, and Provena has acknowledged that it could be ordered to repay any taxes legally levied against it.

-10-

After a lengthy hearing at which voluminous evidence was presented, the administrative law judge (ALJ) assigned to the case recommended that 94.4% of the subject parcels be granted a charitable exemption. She did not address and made no findings regarding Provena Hospitals' alternate claim for a religious exemption.

The Director of Revenue rejected the ALJ's recommendation. He believed that under the evidence and the law, Provena Hospitals had failed to meet its burden of establishing that the property at issue here qualified for a charitable exemption. The Director further concluded that the property did not qualify for a religious exemption under section 15–40 of the Property Tax Code (35 ILCS 200/15–40 (West 2002)).[8]

The circuit court of Sangamon County disagreed with the Director on both counts. In a written order entered on administrative review pursuant to the Administrative Review Law (735 ILCS 5/3–101 *et seq*. (West 2002)), the circuit court held that Provena Hospitals was entitled to both a charitable tax exemption and a religious tax exemption for the subject parcels. As noted earlier in this opinion, the appellate court subsequently reversed. Rejecting the circuit court's view, it held that the Director's decision to deny Provena Hospitals either a charitable or religious exemption for the disputed property was not clearly erroneous. 384 Ill. App. 3d 734. It is in this posture that the matter now comes before our court.

ANALYSIS

The parcels of real estate at issue in this case are all located in Champaign County, which has fewer than 3 million inhabitants. In

---

[8]In turning down Provena Hospitals' claim for a religious exemption, the Director wrote that he was concurring "with the ALJ's recommendation that the property does not qualify for the religious purpose exemption." Because the ALJ did not address the religious purpose exemption, this was obviously a misstatement by the Director. It is evident, however, that the Director did not believe that the hospital complex was entitled to a property tax exemption under any of the bases claimed, including use for religious purposes, and his decision is the one under review.

such counties, applications for exemption from property tax are made, in the first instance, to the county board of review or board of appeals. See 35 ILCS 200/15–5, 16–70 (West 2002). The county board's decision, however, is not final except as to homestead exemptions. With applications for all other exemptions, the matter is forwarded to the Department of Revenue for a determination as to "whether the property is legally liable to taxation." 35 ILCS 200/16–70 (West 2002). The Department of Revenue's procedures with respect to exemption decisions are governed by section 8–35 of the Property Tax Code (35 ILCS 200/8–35 (West 2002)), and such decisions by the Department are subject to judicial review in accordance with the Administrative Review Law (735 ILCS 5/3–101 *et seq.* (West 2002)). 35 ILCS 200/8–40 (West 2002).

When an appeal is taken to the appellate court following entry of judgment by the circuit court on administrative review, it is the decision of the administrative agency, not the judgment of the circuit court, which is under consideration. See *Anderson v. Department of Professional Regulation*, 348 Ill. App. 3d 554, 560 (2004). Similarly, when we grant leave to appeal from a judgment of the appellate court in an administrative review case, as we did here, it is the final decision of the administrative agency, not the judgment of the circuit court or the appellate court, which is before us. *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 504 (2007); *Sangamon County Sheriff's Department v. Illinois Human Rights Comm'n*, 233 Ill. 2d 125, 136 (2009).

Judicial review of administrative decisions is subject to important constraints regarding the issues and evidence that may be considered. If an argument, issue, or defense was not presented in the administrative proceedings, it is deemed to have been procedurally defaulted and may not be raised for the first time before the circuit court. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 213 (2008). In addition, "[t]he findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct" and "[n]o new or additional evidence in support of or in opposition to any finding, order, determination or decision of the administrative agency shall be heard by the court." 735 ILCS 5/3–110 (West 2002). Consistent with these statutory mandates, we have held that "it is not a court's function on

administrative review to reweigh evidence or to make an independent determination of the facts." *Kouzoukas v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 234 Ill. 2d 446, 463 (2009). When an administrative agency's factual findings are contested, the court will only ascertain whether such findings of fact are against the manifest weight of the evidence. *Cook County Republican Party v. Illinois State Board of Elections*, 232 Ill. 2d 231, 244 (2009).

The standard of review is different when the only point in dispute is an agency's conclusion on a point of law. There, the decision of the agency is subject to *de novo* review by the courts.[9] Yet a third standard governs when the dispute concerns the legal effect of a given set of facts, *i.e.*, where the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard. In such cases, which we have characterized as involving a mixed question of law and fact, an agency's decision is reviewed for clear error. *Exelon Corp. v. Department of Revenue*, 234 Ill. 2d 266, 273 (2009).

In the case before us now, the historical facts are not disputed and the governing legal principles are well established. The sole question is whether, under the facts present here, the real property at issue in this case qualifies for an exemption from taxation under the Property Tax Code (35 ILCS 200/1–1 *et seq.* (West 2002)). Under the standards just discussed, this presents a mixed question of law and fact and will therefore be set aside only if clearly erroneous. See *Swank v. Department of Revenue*, 336 Ill. App. 3d 851, 861 (2003); *Metropolitan Water Reclamation District of Greater Chicago*, 313 Ill. App. 3d at 475. This standard is "significantly deferential." See *LeaderTreks, Inc. v. Department of Revenue*, 385 Ill. App. 3d 442, 446 (2008). An administrative decision will be set aside as clearly

---

[9]Even where review is *de novo*, an agency's construction is entitled to substantial weight and deference. Courts accord such deference in recognition of the fact that agencies make informed judgments on the issues based upon their experience and expertise and serve as an informed source for ascertaining the legislature's intent. See *Metropolitan Water Reclamation District of Greater Chicago v. Department of Revenue*, 313 Ill. App. 3d 469, 475 (2000).

erroneous only when the reviewing court is left with the definite and firm conviction that a mistake has been committed. *Exelon Corp.*, 234 Ill. 2d at 273. For reasons we shall now explain, this is not such a case.

Under Illinois law, taxation is the rule. Tax exemption is the exception. All property is subject to taxation, unless exempt by statute, in conformity with the constitutional provisions relating thereto. Statutes granting tax exemptions must be strictly construed in favor of taxation (*Board of Certified Safety Professionals of the Americas, Inc. v. Johnson*, 112 Ill. 2d 542, 547 (1986)), and courts have no power to create exemption from taxation by judicial construction (*City of Chicago v. Illinois Department of Revenue*, 147 Ill. 2d 484, 491 (1992)).

The burden of establishing entitlement to a tax exemption rests upon the person seeking it. *City of Chicago v. Illinois Department of Revenue*, 147 Ill. 2d at 491. The burden is a very heavy one. The party claiming an exemption must prove by clear and convincing evidence that the property in question falls within both the constitutional authorization and the terms of the statute under which the exemption is claimed. See *Streeterville Corp. v. Department of Revenue*, 186 Ill. 2d 534, 539-40 (1999) (Harrison, J., dissenting, joined by McMorrow, J.). A basis for exemption may not be inferred when none has been demonstrated. To the contrary, all facts are to be construed and all debatable questions resolved in favor of taxation (*Follett's Illinois Book & Supply Store, Inc. v. Isaacs*, 27 Ill. 2d 600, 606 (1963)), and every presumption is against the intention of the state to exempt property from taxation (*Reeser v. Koons*, 34 Ill. 2d 29, 36 (1966)). If there is any doubt as to applicability of an exemption, it must be resolved in favor of requiring that tax be paid. *Streeterville Corp. v. Department of Revenue*, 186 Ill. 2d at 539 (Harrison, J., dissenting, joined by McMorrow, J.).

As noted earlier in this opinion, Provena Hospitals has been granted a tax exemption by the federal government. There is no dispute, however, that tax exemption under federal law is not dispositive of whether real property is exempt from property tax under Illinois law. See *Eden Retirement Center, Inc. v. Department of Revenue*, 213 Ill. 2d 273, 291 (2004). Similarly, the fact that Provena Hospitals is exempt from state retailers' occupation, service

occupation, use and service use taxes does not mean that the corporation must likewise be granted an exemption from paying tax on the real property it owns. *People ex rel. County Collector v. Hopedale Medical Foundation*, 46 Ill. 2d 450, 464 (1970); *Willows v. Munson*, 43 Ill. 2d 203, 209 (1969); see *Institute of Gas Technology v. Department of Revenue*, 289 Ill. App. 3d 779, 785 (1997).

Authority to exempt certain real property from taxation emanates from article IX, section 6, of the 1970 Illinois Constitution (lll. Const. 1970, art. IX, §6). Section 6 provides that the General Assembly may, by law, exempt from taxation property owned by "the State, units of local government and school districts" and property "used exclusively for agricultural and horticultural societies, and for school, religious, cemetery and charitable purposes." Ill. Const. 1970, art. IX, §6.

Section 6 is not self-executing. It merely authorizes the General Assembly to enact legislation exempting certain property from taxation. *Chicago Patrolmen's Ass'n v. Department of Revenue*, 171 Ill. 2d 263, 269 (1996). The General Assembly is not required to exercise that authority. Where it does elect to recognize an exemption, it must remain within the limitations imposed by the constitution. No other subjects of property tax exemption are permitted. The legislature cannot add to or broaden the exemptions specified in section 6. *Chicago Bar Ass'n v. Department of Revenue*, 163 Ill. 2d 290, 297 (1994).

While the General Assembly has no authority to grant exemptions beyond those authorized by section 6, it "may place restrictions, limitations, and conditions on [property tax] exemptions as may be proper by general law." *North Shore Post No. 21 of the American Legion v. Korzen*, 38 Ill. 2d 231, 233 (1967). In accordance with this power, the legislature has elected to impose additional restrictions with respect to section 6's charitable exemption. Pursuant to section 15–65 of the Property Tax Code (35 ILCS 200/15–65 (West 2002)), eligibility for a charitable exemption requires not only that the property be "actually and exclusively used for charitable or beneficent purposes, and not leased or otherwise used with a view to profit," but also that it be owned by an institution of public charity or certain other entities, including "old people's homes," qualifying not-for-profit health maintenance organizations, free public libraries and

historical societies. *Chicago Patrolmen's Ass'n v. Department of Revenue*, 171 Ill. 2d at 270.

In *Methodist Old Peoples Home v. Korzen*, 39 Ill. 2d 149, 156-57 (1968), we identified the distinctive characteristics of a charitable institution as follows: (1) it has no capital, capital stock, or shareholders; (2) it earns no profits or dividends but rather derives its funds mainly from private and public charity and holds them in trust for the purposes expressed in the charter; (3) it dispenses charity to all who need it and apply for it; (4) it does not provide gain or profit in a private sense to any person connected with it; and (5) it does not appear to place any obstacles in the way of those who need and would avail themselves of the charitable benefits it dispenses. *Methodist Old Peoples Home v. Korzen*, 39 Ill. 2d at 157. For purposes of applying these criteria, we defined charity as "a gift to be applied *** for the benefit of an indefinite number of persons, persuading them to an educational or religious conviction, for their general welfare–or in some way reducing the burdens of government." *Methodist Old Peoples Home v. Korzen*, 39 Ill. 2d at 156-57.

This court has held, on several occasions, that a "hospital not owned by the State or any other municipal corporation, but which is open to all persons, regardless of race, creed or financial ability," qualifies as a charitable institution under Illinois law provided certain conditions are satisfied. See *People ex rel. Cannon v. Southern Illinois Hospital Corp.*, 404 Ill. 66, 69-70 (1949). There is, however, no blanket exemption under the law for hospitals or health-care providers. Whether a particular institution qualifies as a charitable institution and is exempt from property tax is a question which must be determined on a case-by-case basis. See *Coyne Electrical School v. Paschen*, 12 Ill. 2d 387, 394 (1957).

Provena Hospitals clearly satisfies the first of the factors identified by this court in *Methodist Old Peoples Home v. Korzen* for determining whether an organization can be considered a charitable institution: it has no capital, capital stock, or shareholders. Provena Hospitals also meets the fourth *Korzen* factor. It does not provide gain or profit in a private sense to any person connected with it. While the record focused on PCMC rather than Provena Hospitals, it was assumed by all parties during the administrative proceedings that Provena Hospitals' policies in this regard were the same as those of

PCMC, and it was stipulated that PCMC diverted no profits or funds to individuals or entities for their own interests or private benefit.

The Director correctly points out that PCMC subcontracted many of its operations to third-party providers, including pharmacy, laboratory, laundry and MRI/CT services; the entire emergency department; and the management, administration, and staffing of rehabilitation and cardiovascular surgery programs. One of those third-party providers, the one which furnished lab services to PCMC, was actually owned by Provena Health, Provena Hospitals' parent, and was operated on a for-profit basis. While all of the third-party providers were subject to a conflict of interest policy designed "to prevent private inurement and other conduct that may be inimical to [the organization's] mission," no evidence was presented that any of them were themselves charities or operated on anything other than a for-profit basis. This, however, is not dispositive.

The fact that an organization contracts with third-party, for-profit providers for ancillary services does not, in itself, preclude the organization from being characterized as an institution of charity within the meaning of section 15–65 of the Property Tax Code (35 ILCS 200/15–65 (West 2002)). Virtually all charities must contract with for-profit vendors to one degree or another in order to carry on their operations and perform their charitable functions. See J. Colombo, *Hospital Property Tax Exemption in Illinois: Exploring the Policy Gaps*, 37 Loy. U. Chi. L.J. 493, 521-22 (2006). The real concern is whether any portion of the money received by the organization is permitted to inure to the benefit of any private individual engaged in *managing* the organization. The authority cited by the *Korzen* case with respect to the prohibition against private gain or profit so holds. See *Sisters of the Third Order of St. Francis v. Board of Review*, 231 Ill. 317, 321 (1907). No private enrichment of that type is evident in this case.

While *Korzen* factors one and four thus tilt in favor of characterizing Provena Hospitals as a charitable institution, application of the remaining factors demonstrates that the characterization will not hold. Provena Hospitals plainly fails to meet the second criterion: its funds are not derived mainly from private and public charity and held in trust for the purposes expressed in the charter. They are generated, overwhelmingly, by providing medical

services for a fee. While the corporation's consolidated statement of operations for 2002 ascribes $25,282,000 of Provena Hospitals' $739,293,000 in total revenue to "other revenue," that sum represents a mere 3.4% of the Provena's income, and no showing was made as to how much, if any, of it was derived from charitable contributions. The only charitable donations documented in this case were those made to PCMC, one of Provena Hospitals' subsidiary institutions, and they were so small, a mere $6,938, that they barely warrant mention.

Provena Hospitals likewise failed to show by clear and convincing evidence that it satisfied factors three or five, namely, that it dispensed charity to all who needed it and applied for it and did not appear to place any obstacles in the way of those who needed and would have availed themselves of the charitable benefits it dispenses. While the record is filled with details regarding PCMC's operations, PCMC is but one of numerous institutions owned and operated by Provena Hospitals. It does not hold title to any of the property for which an exemption is sought. The actual owner is Provena Hospitals. As the Director of Revenue expressly concluded, however, "the record contains no information as to Provena Hospitals' charitable expenditures in 2002." *Department of Revenue v. Provena Covenant Medical Center,* No. 04-PT-0014, slip op. at 15 (2004). The Director reasoned that without such information, it is simply "not possible to conclude that the true owner of the property is a charitable institution as required by Illinois law." *Department of Revenue v. Provena Covenant Medical Center,* No. 04-PT-0014, slip op. at 15 (2004). We fully agree. The appellate court was therefore correct when it concluded that this aspect of the Department's decision was not clearly erroneous. See 384 Ill. App. 3d at 750.

As detailed earlier in this opinion, eligibility for a charitable exemption under section 15–65 of the Property Tax Code (35 ILCS 200/15–65 (West 2002)) requires not only charitable ownership, but charitable use. Specifically, an organization seeking an exemption under section 15–65 must establish that the subject property is "actually and exclusively used for charitable or beneficent purposes, and not leased or otherwise used with a view to profit." 35 ILCS 200/15–65 (West 2002). When the law says that property must be "exclusively used" for charitable or beneficent purposes, it means that

-18-

charitable or beneficent purposes are the primary ones for which the property is utilized. Secondary or incidental charitable benefits will not suffice, nor will it be enough that the institution professes a charitable purpose or aspires to using its property to confer charity on others. "[S]tatements of the agents of an institution and the wording of its governing legal documents evidencing an intention to use its property exclusively for charitable purposes will not relieve such institution of the burden of proving that its property actually and factually is so used." *Methodist Old Peoples Home v. Korzen*, 39 Ill. 2d at 157.

In rejecting Provena Hospitals' claim for exemption, the Department determined that the corporation also failed to satisfy this charitable use requirement. As with the issue of charitable ownership, the appellate court concluded that this aspect of the Department's decision was not clearly erroneous. Again we agree.

In explaining what constitutes charity, *Methodist Old Peoples Home v. Korzen*, 39 Ill. 2d at 156-57, applied the definition adopted by our court more than a century ago in *Crerar v. Williams*, 145 Ill. 625 (1893). We held there that

> " 'charity, in a legal sense, may be more fully defined as a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works, or otherwise lessening the burthens of government.' " *Crerar v. Williams*, 145 Ill. at 643, quoting *Jackson v. Phillips*, 96 Mass. 539, 556 (1867).

Following *Crerar*, we explained that "[t]he reason for exemptions in favor of charitable institutions is the benefit conferred upon the public by them, and a consequent relief, to some extent, of the burden upon the State to care for and advance the interests of its citizens." *People v. Young Men's Christian Ass'n of Chicago*, 365 Ill. 118, 122 (1936). See also *People ex rel. Carr v. Alpha Pi of Phi Kappa Sigma Educational Ass'n of the University of Chicago*, 326 Ill. 573, 578 (1927) ("The reason for exempting certain property from public taxes arises from the fact that such property, in its use for charitable

purposes, tends to lessen the burdens of government and to affect the general welfare of the public"). Our court continues to apply this rationale. See *Quad Cities Open, Inc. v. City of Silvis*, 208 Ill. 2d 498, 509-10 (2004).

Conditioning charitable status on whether an activity helps relieve the burdens on government is appropriate. After all, each tax dollar lost to a charitable exemption is one less dollar affected governmental bodies will have to meet their obligations directly. If a charitable institution wishes to avail itself of funds which would otherwise flow into a public treasury, it is only fitting that the institution provide some compensatory benefit in exchange. While Illinois law has never required that there be a direct, dollar-for-dollar correlation between the value of the tax exemption and the value of the goods or services provided by the charity, it is a *sine qua non* of charitable status that those seeking a charitable exemption be able to demonstrate that their activities will help alleviate some financial burden incurred by the affected taxing bodies in performing their governmental functions.

Our state and federal governments have both undertaken to provide health care for individuals meeting various criteria. To the extent Provena Hospitals' operations help reduce the burdens faced by those levels of government in providing health care, it may therefore be appropriate for Provena Hospitals to qualify for state and federal tax exemptions. Those taxes, however, are not at issue here, and we make no ruling regarding them. The case before us is concerned solely with Provena Hospitals' eligibility for a *property tax* exemption for the 43 parcels of real estate in the PCMC complex. If permitted, that exemption would result in the loss of tax revenue by the following taxing districts: Champaign County, Champaign County Forest Preserve District, Community College District 505, Unit School District 116, Urbana Corporation, Cunningham Township, Urbana-Champaign Sanitary District, Urbana Park District, Champaign-Urbana Mass Transit District, and Champaign-Urbana Public Health District. The record is devoid of findings regarding any of these taxing bodies or the services and support they provide to Champaign County residents. As a result, we have no way to judge how, if at all, Provena Hospitals' use of its PCMC property in 2002 lessened the burdens those bodies would otherwise have been

required to bear.[10]

We further note that even if there were evidence that Provena Hospitals used the PCMC property to provide the *type* of services which the local taxing bodies might find helpful in meeting their obligations to the citizenry of Champaign County, that still would not suffice, in itself, to meet this requirement. The *terms* of the service also make a difference. As the appellate court correctly recognized, " 'services extended *** for value received *** do not relieve the [s]tate of its burden.' " 384 Ill. App. 3d at 744, quoting *Willows v. Munson*, 43 Ill. 2d 203, 208 (1969).

The situation before us here stands in contrast to *People ex rel. Cannon v. Southern Illinois Hospital Corp.*, 404 Ill. 66 (1949). In that case, the hospital seeking the charitable exemption adduced evidence showing that the county in question did undertake to provide treatment for indigent residents. The hospital charged the county deeply discounted rates to treat those patients. Moreover, because the hospital was the only one in the area, the court reasoned that its acceptance of relief patients relieved the government from having to transport and pay for the treatment of those patients elsewhere. *People ex rel. Cannon*, 404 Ill. at 73-74. As a result, the hospital's operations could be said to reduce a burden on the local taxing body. No such conclusion was made or could be made based on the record in this case.

Even if Provena Hospitals were able to clear this hurdle, there was ample support for the Department of Revenue's conclusion that Provena failed to meet its burden of showing that it used the parcels in the PCMC complex actually and exclusively for charitable purposes. As our review of the undisputed evidence demonstrated, both the number of uninsured patients receiving free or discounted care and the dollar value of the care they received were *de minimus*.

---

[10]In reaching this conclusion, we do not mean to suggest that Provena Hospitals' entitlement to a charitable property tax exemption was dependent on its ability to show that its use of the PCMC parcels reduced the burden on each of the affected taxing districts. It was, however, required to demonstrate that its use of the property helped alleviate the financial burdens faced by the county or at least one of the other entities supported by the county's taxpayers.

-21-

With very limited exception, the property was devoted to the care and treatment of patients in exchange for compensation through private insurance, Medicare and Medicaid, or direct payment from the patient or the patient's family.

To be sure, Provena Hospitals did not condition the receipt of care on a patient's financial circumstances. Treatment was offered to all who requested it, and no one was turned away by PCMC based on their inability to demonstrate how the costs of their care would be covered. The record showed, however, that during the period in question here, Provena Hospitals did not advertise the availability of charitable care at PCMC. Patients were billed as a matter of course, and unpaid bills were automatically referred to collection agencies. Hospital charges were discounted or waived only after it was determined that a patient had no insurance coverage, was not eligible for Medicare or Medicaid, lacked the resources to pay the bill directly, and could document that he or she qualified for participation in the institution's charitable care program. As a practical matter, there was little to distinguish the way in which Provena Hospitals dispensed its "charity" from the way in which a for-profit institution would write off bad debt. Under similar circumstances, our appellate court has consistently refused to recognize a medical facility's actions as the bestowal of charity within the meaning of section 15–65 of the Property Tax Code (35 ILCS 200/15–65 (West 2002). See *Riverside Medical Center v. Department of Revenue*, 342 Ill. App. 3d 603, 608-09 (2003); *Alivio Medical Center v. Department of Revenue*, 299 Ill. App. 3d 647, 651-52 (1998); *Highland Park Hospital v. Department of Revenue*, 155 Ill. App. 3d 272, 280-81 (1987). The appellate court's decision in the present case is in accord with this line of precedent.

The minimal amount of charitable care dispensed by Provena Hospitals at the PCMC complex cannot be rationalized on the grounds that the area's residents did not require additional services. For one thing, the argument that there really was no demand for additional charitable care in Champaign County is one that Provena Hospitals cannot comfortably make. That is so because such a contention, if true, would bring into question the veracity of the corporation's claim that it is committed to the values of the Catholic health-care ministry PCMC was purportedly obligated to advance.

-22-

One of those values was that the institution was to

> "distinguish itself by service to and advocacy for those people whose social condition puts them at the margins of our society and makes them vulnerable to discrimination: the poor[,] the uninsured and the underinsured."

If the number of poor, uninsured and underinsured residents of Champaign County was as insignificant as PCMC's charitable care program reflects, the opportunities for Provena Hospitals to further its mission there would be virtually nonexistent. And if the opportunites were so limited, it is difficult to understand why Provena Hospitals would continue to devote its resources to serving that community. The only plausible explanation would be that its principle purposes in operating PCMC were, in reality, more temporal than it professes.

The argument is problematic for other reasons as well. Federal census figure show that approximately 13.4% of Champaign County's more than 185,000 residents have incomes below the federal poverty guidelines. That amounts to nearly 25,000 people. In addition, nearly 20,000 county residents are estimated to be without any health-care coverage. There is no reason to believe that these groups of indigent and/or uninsured citizens are any healthier than the population at large. To the contrary, experience teaches that such individuals are likely to have significant unmet health-care needs. If Provena Hospitals were truly using the PCMC complex exclusively for charitable purposes, one would therefore expect to see a significant portion of its annual admissions served by Provena Hospitals' charitable care policy. Instead, as we have noted, a mere 302 of its 110,000 admissions received reductions in their bills based on charitable considerations.

Further undermining Provena Hospitals' claims of charity is that even where it did offer discounted charges, the charity was often illusory. As described earlier in this opinion, uninsured patients were charged PCMC's "established" rates, which were more than double the actual costs of care. When patients were granted discounts at the 25% and 50% levels, the hospital was therefore still able to generate a surplus. In at least one instance, the discount was not applied until after the patient had died, producing no benefit to that patient at all. Moreover, it appears that in every case when a "charitable" discount was granted or full payment for a bill was otherwise not received, the

corporation expected the shortfall to be offset by surpluses generated by the higher amounts it was able to charge other users of its facilities and services. Such "cross-subsidies" are a pricing policy any fiscally sound business enterprise might employ. We cannot fault Provena Hospitals for following this strategy, and there is no question that an institution is not ineligible for a charitable exemption simply because those patients who are able to pay are required to do so. *Sisters of the Third Order of St. Francis v. Board of Review*, 231 Ill. 317, 321 (1907). We note merely that such conduct is in no way indicative of any form of charitable purpose or use of the subject property.[11]

The minimal amount of free and discounted care provided at the PCMC cannot be excused under the theory that aid to indigent persons is not a prerequisite to charity. In the context of municipal taxation, we recently reaffirmed that, under Illinois law, charity "is not confined to the relief of poverty or distress or to mere almsgiving" but may also include gifts to the general public use from which the rich as well as to the poor may benefit. *Quad Cities Open, Inc. v. City of Silvis*, 208 Ill. 2d 498, 510-11 (2004), quoting *People v. Young Men's Christian Ass'n of Chicago*, 365 Ill. 118, 122 (1936). It is a fundamental principle of law, however, that a gift is "a voluntary, gratuitous transfer of property by one to another," and that "[i]t is essential to a gift that it should be without consideration." *Martin v. Martin*, 202 Ill. 382, 388 (1903). When patients are treated for a fee, consideration is passed. The treatment therefore would not qualify as a gift. If it were not a gift, it could not be charitable.

Provena Hospitals argues that the amount of free and discounted care it provides to self-pay patients at the PCMC complex is not an accurate reflection of the scope of its charitable use of the property. In its view, its treatment of Medicare and Medicaid patients should also be taken into account because the payments it receives for

---

[11]Some commentators have been more pointed in assessing the charitable nature of this practice. See M. Bloche, *Health Policy Below the Waterline: Medical Care and the Charitable Exemption*, 80 Minn. L. Rev. 299, 355 (1995) ("the imagery of charity rings hollow when it comes to hospitals" because, most obviously, "the free care provided by nonprofit hospitals is financed largely by private payers, who are hardly inspired by donative benevolence").

treating such patients do not cover the full costs of care. As noted earlier in this opinion, however, participation in the Medicare and Medicaid is not mandatory. Accepting Medicare and Medicaid patients is optional. While it is consistent with Provena Hospitals' mission, it also serves the organization's financial interests. In exchange for agreeing to accept less than its "established" rate, the corporation receives a reliable stream of revenue and is able to generate income from hospital resources that might otherwise be underutilized. Participation in the programs also enables the institution to qualify for favorable treatment under federal tax law, which is governed by different standards.

Mindful of such considerations, our appellate court has held that discounted care provided to Medicare and Medicaid patients is not considered charity for purposes of assessing eligibility for a property tax exemption. See *Riverside Medical Center v. Department of Revenue*, 342 Ill. App. 3d at 610; see also *Alivio Medical Center v. Department of Revenue*, 299 Ill. App. 3d at 651-52 (charitable real estate exemption denied to medical center where, *inter alia*, most of the center's revenue was derived from patient fees and the majority of those fees were Medicaid payments). Similarly, the Catholic Health Association of the United States, one of the signatories to a friend of the court brief filed in this case in support of Provena Hospitals, does not include shortfalls from Medicaid and Medicare payments in its definition of charity. Provena Health itself adopted this view. The consolidated financial statements and supplementary information it prepared for itself and its affiliates for 2001 and 2002 did not identify any costs or charges incurred by PCMC in connection with subsidizing Medicaid or Medicare patients in its explanation of "charity care." That being so, it can scarcely complain that such costs and charges should have been included by the Department in evaluating Provena Hospitals' charitable contributions.[12]

---

[12]It would, in fact, be anomalous to characterize services provided to Medicare and Medicaid patients as charity. That is so because, as the Department correctly points out, charity is, by definition, a type of gift and gifts, as we have explained, must, by definition, be gratuitous. Hospitals do not serve Medicare and Medicaid patients gratuitously. They are paid to do so.

Provena Hospitals asserts that assessment of its charitable endeavors should also take into account subsidies it provides for ambulance service, its support of the crisis nursery, donations made to other not-for-profit entities, volunteer initiatives it undertakes, and support it provides for graduate medical education, behavioral health services, and emergency services training. This contention is problematic for several reasons. First, while all of these activities unquestionably benefit the community, community benefit is not the test. Under Illinois law, the issue is whether the property at issue is used exclusively for a charitable purpose.[13]

Provena Hospitals' decision to make charitable contributions to other not-for-profit entities does not demonstrate an exclusively charitable use of the PCMC complex. Indeed, it tells us nothing about the use of the property at all. It is relevant only with respect to the question of how Provena Hospitals elected to disburse funds generated by the facility. That, however, is not dispositive. The critical issue is the use to which the property itself is devoted, not the use to which income derived from the property is employed. See *City of Lawrenceville v. Maxwell*, 6 Ill. 2d 42, 49 (1955); see also *People ex rel. Goodman v. University of Illinois Foundation*, 388 Ill. 363,

---

[13]Illinois' charity requirements distinguish our property tax exemption standards from the requirements a hospital must meet in order to qualify for tax-exempt status under the Internal Revenue Code. When the Medicare and Medicaid programs were being established in the late 1960s, there was concern that many hospitals would lose their federal tax exempt status because there would no longer be sufficient demand for charity care to satisfy IRS requirements. In response, the IRS loosened its previous standards, under which hospitals were required to provide financial assistance to those who could not afford to pay for services, and began to measure a hospital's eligibility for tax exemption by utilizing other "community benefit" factors. Adoption of this community benefit standard "abandoned charity care as the touchstone of exemption at the federal level." See 37 Loy. U. Chi. L.J. at 497. Illinois has not adopted this approach. Although our General Assembly now requires certain hospitals in Illinois to file annual "community benefits plans" with the Illinois Attorney General's office (see 210 ILCS 76/1 *et seq* (West 2006)) that requirement is not part of the Property Tax Code and does not purport to alter Illinois law with respect to property tax exemptions.

374 (1944) ("the test [is] the present use of the property rather than the ultimate use of the proceeds derived from the property sought to be exempted").[14]

With respect to the ambulance subsidy, the costs for most patients who were transported by ambulance appear to have been covered by third-party insurers. The deficit claimed by Provena may therefore result primarily from the reduced rates insurers are allowed to pay, something which clearly would not qualify as charitable in nature. How much, if any, is attributable to free or discounted service provided to those who could not afford to pay is not apparent from the record.[15] We further note (1) that there is no evidence that any of the 43 parcels for which an exemption is sought was ever used directly or indirectly for the ambulance service, and (2) that the ambulance service provided noncharitable benefits to the institution. It complemented PCMC's emergency room, which it was required by law to provide and which was operated by a for-profit corporation, and enhanced PCMC's ability to fill its beds and cover its fixed costs.

The volunteer classes and services cited by Provena Hospitals included such items as free health screenings, wellness classes, and classes on handling grief. Again, while beneficial to the community, they were not necessarily charitable. Private for-profit companies frequently offer comparable services as a benefit for employees and customers and a means for generating publicity and goodwill for the organization.[16]

The behavioral health subsidy listed by Provena Hospitals

_____

[14]Even as to the nature of Provena Hospitals, the donations tell us little. Charitable contributions, after all, can be made by anyone. They are not the exclusive or even the primary domain of charitable organizations.

[15]We do know from testimony presented by PCMC's chief financial officer at the administrative hearing that none of it involved Medicaid or Medicaid patients.

[16]That such programs can serve as an effective advertising tool was well understood by PCMC's management, which explained that part of the reason for the programs they offered was to let the community know "where they can go for services if they need more health care."

involved operation of two shelters, one primarily for adult men and the other for runaway teens. These shelters do not appear to have been located on the PCMC complex, and the connection between the medical services offered at PCMC and the operation of the shelters was not explained. So far as we can tell, the only relationship between the PCMC complex and the shelters is that PCMC's owner helped support the shelters financially. As in the case of donations to other charitable organizations, however, that does not demonstrate that the subject property is used exclusively for charitable purposes.

The amount Provena Hospitals devoted to emergency medical services suffers from similar problems. These services, which were described as training "prehospital responders and providers in how to most effectively respond to patients in need as they are responding and transporting those patients to the hospital," are furnished to "about 175 different agencies throughout Central Illinois." There is no indication that any of that training actually occurs on the premises of the PCMC complex. Indeed, from the record before us, we cannot tell whether any of this training even occurs in Champaign County.

Provena Hospitals' reliance on this expense is problematic for other reasons as well. None of the taxing bodies affected by the exemption sought by Provena here is claimed to be responsible for training health-care professionals, and they are certainly not responsible for training health-care professionals outside their jurisdictions. As a result, Provena Hospitals' decision to support this training does not relieve any of these taxing bodies of any burden they would otherwise be required to bear. Another key element for charity eligibility is therefore absent. We further note that the decision to train "prehospital responders and providers" is not necessarily altruistic. In a competitive health-care environment, it may be an effective means for increasing awareness of the hospital, encouraging others outside the immediate community to use its services.

Provena Hospitals' reliance on expenses associated with the medical residency program is also problematic. The record indicates that the program is run by the University of Illinois and that Provena Hospitals receives reimbursement for participating in it. Although the corporation apparently does not believe that the reimbursement covers the full actual costs of its affiliation with the residency program, PCMC's president and chief operating officer, who testified

-28-

about this item at the administrative hearing, did not explain how the claimed shortfall was computed. We note, moreover, that in addition to generating direct payments from the University, Provena Hospitals' participation in the program unquestionably adds to PCMC's prestige and enables it to supplement its medical staff with well-trained, if inexperienced, physicians. While we cannot exclude the possibility that there is some charity in this relationship, it is difficult to know in which direction such charity flows, from Provena Hospitals to the University of Illinois or vice versa.

That leaves only the $25,851 Provena Hospitals attributes to crisis nursery services and support. The nursery services to which Provena Hospitals refers are provided by the Crisis Nursery in Urbana. Crisis Nursery is a separate not-for-profit entity. Although some PCMC employees serve on its board of directors, it has no corporate affiliation with PCMC or Provena Health. Crisis Nursery paid to construct the facilities it uses and maintains its own staff. The land on which its facilities are situated is, however, owned by Provena Health. Provena Health allows Crisis Nursery use of the land under a long-term lease for a nominal rent of $1 per year. Provena also furnishes various in-kind services to the nursery including telephone service, utilities, building and grounds maintenance, laundry, meals, occasional medical consultations for children using the nursery, and meeting space at PCMC for meetings and other events. In addition, Provena Hospitals periodically helps sponsor fund raising events held by the Crisis Nursery.

As its name implies, the Crisis Nursery provides a temporary haven for young children whose families are experiencing some form of crisis. When parents reach the point, for whatever reason, that they are incapable of caring for their children or pose a threat to their children's well-being, the Crisis Nursery will take the child in temporarily. It sometimes also admits children when mothers who are making the transition from welfare to the work force need child assistance in order to manage their work schedules. The goal, always, is to protect children from situations in which they may be at heightened risk of abuse or neglect.

The Crisis Nursery is designed for infants and children up to age five. The facility allows children to stay overnight, if necessary, for up to three days, though longer stays are sometimes permitted. During

these stays, the Crisis Nursery feeds and bathes the children and provides them with "developmentally appropriate activities." Post-visit family support services are offered in order to help improve parenting skills and stabilize children's home environments. The Crisis Nursery also serves as a conduit for various social services for poor families and children in need.

Of the 43 real estate parcels involved in this, the four utilized by the Crisis Nursery may have the strongest claim on being used exclusively for charitable purposes. Even if we assume an exclusive charitable use to have been established, however, it would not aid Provena Hospitals' position. Charitable use of these four parcels would not, under any legal theory, be sufficient to also confer a charitable exemption on the remaining 39 parcels comprising the PCMC complex. Moreover, even as to these four parcels, the claim for exemption must fail. That is so because a critical qualification for the exemption is absent. For the reasons set forth earlier in this opinion, Provena Hospitals, the actual owner of the four parcels, failed to meet its burden of establishing that it is a charitable institution. Without charitable ownership as well as charitable use, no exemption is permitted. The Department of Revenue was therefore correct when it denied Provena Hospitals' request for a charitable exemption as to any of the 43 parcels comprising the PCMC complex.

We likewise find no error in the Department of Revenue's rejection of Provena Hospitals' request for a religious exemption under section 15–40(a)(1) of the Property Tax Code (35 ILCS 200/15–40(a)(1) (West 2002)). To qualify for an exemption under that statute, the property in question must be used exclusively for religious purposes. There is no all-inclusive definition of religious purpose for tax cases. Whether an entity has been organized and operated exclusively for religious purposes is determined from its charter, bylaws, and actual method and facts relating to its operation. See *Fairview Haven v. Department of Revenue*, 153 Ill. App. 3d 763, 774 (1987), citing *Scripture Press Foundation v. Annunzio*, 414 Ill. 339, 349 (1953). As with the claim for a charitable exemption, it was Provena Hospitals' burden to show, by clear and convincing evidence, that it satisfied these requirements. As with its claim for a charitable exemption, it failed to do so.

Provena Hospitals' claim to a religious exemption is founded largely on the proposition that it is, itself, a ministry of the Catholic Church. A threshold problem with this argument is that the facts cited to support it pertain to PCMC, not Provena Hospitals. According to evidence presented in the administrative proceeding, which we cited earlier in this opinion, the articles of consolidation adopted when Provena Hospitals was formed state that its purpose is to "coordinate the activities of Provena Hospitals' subsidiaries or other organizations that are affiliated with Provena Hospitals as they pursue their religious, charitable, educational and scientific purposes" and "to offer at all times high quality and cost effective healthcare and human services to the consuming public." While there is plainly a religious component to this mission, advancing religion is not identified as the corporation's dominant purpose.

Provena Hospitals suggests that we cure this evidentiary problem by imputing the religious values underlying the church's support of PCMC to Provena Hospitals itself. But we can no more do that than we could deem the corporation a charity based on what PCMC alone did. Such a course would require that we resolve facts and debatable questions in favor of exemption. The law requires just the opposite.

Even if Provena Hospitals could overcome this obstacle, its claim to a religious exemption for the 43 parcels at issue in this case would fail. Religious purpose is not determined solely by the professed motives or beliefs of the property's owner. A court must also take into account the facts and circumstances regarding how the property is actually used. See *People ex rel. McCullough v. Deutsche Evangelisch Lutherische Jehovah Gemeinde Ungeaenderter Augsburgischer Confession*, 249 Ill. 132, 136 (1911). As the appellate court recently observed, intentions are not enough. We must ask whether, in actuality or practice, the building is used primarily for a religious purpose. "In a sense, everything a deeply devout person does has a religious purpose," the court explained,

> "[b]ut if that formulation determined the exemption from property taxes, religious identity would effectively be the sole criterion. A church could open a restaurant, for instance, and because waiters attempted to evangelize customers while taking their orders, the restaurant would be exempt. But the operation of a restaurant is not necessary for evangelism and

-31-

religious instruction, although, like any other social activity, it can provide the occasion for those religious purposes." See *Faith Builders Church, Inc. v. Department of Revenue*, 378 Ill. App. 3d 1037, 1046 (2008) (denying a religious exemption for property used by a church group for a fee-based day-care center serving infants, toddlers and preschool children).

In this case, the record clearly established that the primary purpose for which the PCMC property was used was providing medical care to patients for a fee. Although the provision of such medical services may have provided an opportunity for various individuals affiliated with the hospital to express and to share their Catholic principles and beliefs, medical care, while potentially miraculous, is not intrinsically, necessarily, or even normally religious in nature. We note, moreover, that no claim has been made that operation of a fee-based medical center is in any way essential to the practice or observance of the Catholic faith.

Provena Hospitals argues that religious institutions alone have the right to assess the religious nature of their activities and that courts may not second-guess those assessments without violating constitutional guarantees regarding the free exercise of religion (see Ill. Const. 1970, art. I, §3; U.S. Const., amend. I). If Provena Hospitals' argument were valid, it would mean that the church rather than the judiciary is the ultimate arbiter of when and under what circumstances church property is exempt from taxation under the constitution and statutes of the State of Illinois. Provena Hospitals has not cited any authority to support such a claim, nor was it raised by Provena Hospitals in its petition for leave to appeal. It is therefore not properly before us. See *Vine Street Clinic v. HealthLink, Inc.*, 222 Ill. 2d 276, 301 (2006); *People v. Whitfield*, 228 Ill. 2d 502, 509 (2007).

CONCLUSION

For the foregoing reasons, the Department of Revenue properly denied the charitable and religious property tax exemptions requested by Provena Hospitals in this case. The judgment of the appellate court reversing the circuit court and upholding the Department's decision is therefore affirmed.

*Affirmed.*

JUSTICES KILBRIDE and GARMAN took no part in the consideration or decision of this case.

JUSTICE BURKE, concurring in part and dissenting in part:

I join that portion of the plurality opinion which holds that Provena Hospitals failed to demonstrate it was entitled to a religious exemption based on the lack of sufficient evidence. See slip op. at 30-32.

I also join the plurality opinion's conclusion that Provena Hospitals failed to establish it is a charitable institution. The defining characteristics of a charitable institution include, *inter alia*, that the institution dispenses charity to all who need it and apply for it, and that it does not appear to place any obstacles in the way of those who need and would avail themselves of the charitable benefits it dispenses. *Methodist Old Peoples Home v. Korzen*, 39 Ill. 2d 149, 157 (1968). There is evidence in the record detailing Provena Covenant Medical Center's (PCMC) charity care policy, evidence that PCMC's staff engaged in outreach efforts to communicate the availability of charity care and encouraged patients to apply, and evidence that charitable care would be considered by PCMC at any time. However, there is no such evidence in connection with Provena Hospitals, the actual owner of the subject property. Accordingly, the record in the case at bar is inadequate to establish that Provena Hospitals is a charitable institution, a necessary prerequisite to receiving a charitable exemption. For this reason alone, I agree with the plurality that Provena Hospitals is not entitled to a charitable exemption in this case.

I do not join that portion of the plurality opinion which addresses the doctrine of charitable use. Without citation to authority, the plurality holds that Provena Hospital's use of the property in 2002 was not a "charitable use" because the charity care provided was *de minimus*. Specifically, the plurality concludes that "there was ample support for the Department of Revenue's conclusion that Provena failed to meet its burden of showing that it used the parcels in the PCMC complex actually and exclusively for charitable purposes. As

-33-

our review of the undisputed evidence demonstrated, both the number of uninsured patients receiving free or discounted care and the dollar value of the care they received were *de minimus*." Slip op. at 21. I disagree with this rationale. By imposing a quantum of care requirement and monetary threshold, the plurality is injecting itself into matters best left to the legislature.

The legislature did not set forth a monetary threshold for evaluating charitable use. We may not annex new provisions or add conditions to the language of a statute. *Hines v. Department of Public Aid*, 221 Ill. 2d 222, 231 (2006). Yet, this is exactly what the plurality does. The Michigan Supreme Court in *Wexford Medical Group v. City of Cadillac*, 474 Mich, 192, 713 N.W.2d 734 (2006), aptly set out this principle. In *Wexford*, the court held that "there can be no threshold [dollar amount of free medical services provided] imposed under the statute. The Legislature provided no measuring device with which to gauge an institution's charitable composition, and we cannot presuppose the existence of one. To say that an institution must devote a certain percentage of its time or resources to charity before it merits a tax exemption places an artificial parameter on the charitable institution statute that is unsanctioned by the Legislature." *Wexford*, 474 Mich. at 213, 713 S.W.2d at 745.

Not only did the *Wexford* court reject a monetary threshold because it was not provided for in the statute, the court also believed it would be unwise to impose such a requirement, finding that such a requirement "would be, by its very nature, quite arbitrary." *Wexford*, 474 Mich. at 213, 713 S.W.2d at 745. In addition, the court stated:

> "As petitioner aptly pointed out, there are multiple reasons why inventing legislative intent in this regard would be ill-advised and most unworkable. In fact, the difficulties with formulating a monetary threshold illuminate why setting one is the Legislature's purview, not the courts'. To set such a threshold, significant questions would have to be grappled with. For instance, a court would have to determine how to account for the indigent who do not identify themselves as such but who nonetheless fail to pay. A court would have to determine whether facilities that provide vital health care should be treated more leniently than some other type of charity because of the nature of its work, or even if a health

care provider in an underserved area, such as petitioner, is more deserving of exemption than one serving an area of lesser need. A court would need to consider whether to premise the exemption on whether the institution had a surplus and whether providing below-cost care constitutes charity. Clearly, courts are unequipped to handle these and many other unanswered questions. Simply put, these are matters for the Legislature." *Wexford*, 474 Mich. at 214, 713 S.W.2d at 745-46.

The *Wexford* court concluded: "[I]t does not follow that an institution must present evidence of a particular level of charitable care because there is no such threshold level contained in the statute. And we refuse to create one." (Emphasis omitted.) *Wexford*, 474 Mich. at 220, 713 S.W.2d at 748.

Similarly, in *Medical Center Hospital of Vermont, Inc. v. City of Burlington*, 152 Vt. 611, 566 A.2d 1352 (1989), the Vermont Supreme Court, in rejecting the taxing authority's argument that the amount of free care dispensed must exceed revenues, concluded there was nothing in any Vermont case that required an institution to dispense *any* free care to qualify as charitable for purposes of the charitable property tax exemption. *Medical Center Hospital of Vermont*, 152 Vt. at 616, 566 A.2d at 1354. In fact, the court had previously held that " '[t]he fact that none of its patients are cared for without charge does not deprive [an institution] of its charitable feature.' [Citation.]" (Emphasis omitted.) *Medical Center Hospital of Vermont*, 152 Vt. at 616, 566 A.2d at 1355. The court further concluded, "[T]his state has never required a certain percentage of free care to be rendered before finding an organization to be a tax-exempt charity ***." *Medical Center Hospital of Vermont*, 152 Vt. at 616, 566 A.2d at 1355. The court declared: "In our opinion, pegging charitability to a stated amount of free care rendered would not be workable in determining an organization's taxable status. Instead, uncertainty would reign ***." *Medical Center Hospital of Vermont*, 152 Vt. at 616, 566 A.2d at 1355. Rather, "[t]he better inquiry, it seems to us, is the one used by the trial court in this case: whether health care was made available by the plaintiff to all who needed it, regardless of their ability to pay." *Medical Center Hospital of Vermont*, 152 Vt. at 617, 566 A.2d at 1355.

In addition to the difficulties in formulating a monetary threshold pointed out by the *Wexford* court, the *Medical Center* court noted another problem that would be encountered if a quantum approach is imposed–uncertainty. Specifically, taxability would necessarily be determined on a year to year basis, depending upon economic factors which are not in the control of an organization. *Medical Center Hospital of Vermont*, 152 Vt. at 617, 566 A.2d at 1355. The court stated: "As plaintiff pointed out at trial, if the economy in the Burlington area were to fall off dramatically and unemployment to soar, fewer people would be covered by health care insurance through employers and, consequently, more free care would be rendered to those in need. Should the economy make a turnaround the following year, the amount of free care given might fall again should unemployment levels drop." *Medical Center Hospital of Vermont*, 152 Vt. at 617 n.3, 566 A.2d at 1355 n.3. See also *City of Richmond v. Richmond Memorial Hospital*, 202 Va. 86, 90, 116 S.E.2d 79, 81-82 (1960) ("A tax exemption cannot depend upon any such vague and illusory concept as the percentage of free service actually rendered. This would produce chaotic uncertainty and infinite confusion, permitting a hodgepodge of views on the subject. Thus there would be no certainty nor uniformity in the application of the section involved").

I find these authorities persuasive. I do not believe this court can, under the plain language of section 15–65, impose a quantum of care or monetary requirement, nor should it invent legislative intent in this regard. Setting a monetary or quantum standard is a complex decision which should be left to our legislature, should it so choose. The plurality has set a quantum of care requirement and monetary requirement without any guidelines. This can only cause confusion, speculation, and uncertainty for everyone: institutions, taxing bodies, and the courts. Because the plurality imposes such a standard, without any authority to do so, I cannot agree with it.

I also disagree with the plurality's conclusion that Provena Hospitals was "required to demonstrate that its use of the property helped alleviate the financial burdens faced by the county or at least one of the other entities supported by the county's taxpayers." Slip op. at 20 n.10. Alleviating some burden on government is the reason underlying the tax exemption on properties, not the test for

determining eligibility. Despite acknowledging this (slip op. at 19-20), the plurality converts this rationale into a condition of charitable status. I neither agree with this, nor do I believe that Provena Hospitals failed to show it alleviated some burden on government.

In *Wexford*, the court, similar to the plurality, defined charity as:

" '[Charity] \*\*\* [is] a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government.' " *Wexford*, 474 Mich. at 211, 713 N.W.2d at 744, quoting *Retirement Homes of the Detroit Annual Conference of the United Methodist Church, Inc. v. Sylvan Township*, 416 Mich. 340, 348-49, 330 N.W.2d 682, 686 (1982), quoting *Jackson v. Phillips*, 96 Mass. 539, 556 (1867).

See slip op. at 19, quoting *Crerar v. Williams*, 145 Ill. at 643, quoting *Jackson v. Phillips*, 96 Mass. 539, 556 (1867).

The Michigan court then concluded: "Implicit in the definition is that relieving bodies from disease or suffering is lessening the burden of government." (Emphasis omitted.) *Wexford*, 474 Mich. at 219, 713 N.W.2d at 748. That court specifically held that "petitioner does not have to prove that its actions lessen the burden of government. Rather, it has to prove, as it did, that it 'reliev[es] their bodies from disease, suffering or constraint,' which is, by its nature, a lessening of the burden of government." *Wexford*, 474 Mich. at 219, 713 N.W.2d at 748. I believe the Michigan Supreme Court's conclusion is correct. While "lessening the burden of government" is a component of the definition of charity, it is inextricably tied to the public policy justifying the exemption itself and is not a requirement for demonstrating entitlement to the exemption. The plurality here errs in requiring Provena Hospitals to specifically demonstrate some burden of government it relieved. There is no such requirement.

For the above reasons, I cannot join in the charitable use portion

of the plurality opinion. I note that the discussion of charitable use does not command a majority of the court and, therefore, is not binding under the doctrine of *stare decisis*.

JUSTICE FREEMAN joins in this partial concurrence and partial dissent.