2015 IL App (1st) 132847

No. 1-13-2847

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THEORTHE HANKS, SR., on behalf of Theorthe Hanks, Jr., | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 12 CH 28794 |
| ILLINOIS DEPARTMENT OF HEALTHCARE AND FAMILY SERVICES and DIRECTOR OF ILLINOIS DEPARTMENT OF HEALTHCARE AND FAMILY SERVICES, | ) ) ) ) | The Honorable Rita Novak, Judge Presiding. |
| Defendants-Appellants. | ) ) | |

_____

PRESIDING JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Justices Lavin and Mason concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendants, the Illinois Department of Healthcare and Family Services (the Department) and its director, appeal an order of the circuit court reversing the Department's administrative decision to reduce the number personal assistant service plan hours to which Theorthe Hanks, Jr., (Jason) was entitled as a recipient of benefits pursuant to the Department's Home Services Program (HSP or Program). On appeal, defendants argue that the Department's decision to allocate 178.75 personal service hours per month to Jason was not clearly erroneous; rather it

was based on the Department's careful consideration of Jason's needs as well as its own governing regulations. Accordingly, defendants argue that the Department's final administrative decision should be reinstated. For the reasons set forth herein, we reverse the judgment of the circuit court.

¶ 2                                                    BACKGROUND

¶ 3          The Department's Home Services Program "is a Medicaid Waiver Program (42 CFR 440.180) designed to prevent the unnecessary institutionalization of individuals who may instead be satisfactorily maintained at home at lesser cost to the State." 89 Ill. Adm. Code § 676.10(a) (1999). To that end, the Program provides funding for individuals diagnosed with various disabilities and impairments to obtain the care and assistance necessary to allow them to remain in their personal residences. 89 Ill. Adm. Code § 676.30(j) (2014). A variety of services are available under the Program including personal assistant services, adult day care services, homemaker services, maintenance home health services, home delivered meals, day habilitation services, and behavioral services. 89 Ill. Adm. § 676.40 (2014). Ultimately, the "service level, combination of services, and amount of services for which a customer is eligible is dependent upon the needs of the customer." 89 Ill. Adm. § 676.40 (2014). To determine an individual's eligibility and need for any of the aforementioned services, the Department utilizes a Determination of Need (DON) assessment tool. 89 Ill. Adm. § 679.10 (2015). This tool assesses an individual's impairment with respect to 15 specific Activities of Daily Living (ADLs): "eating, bathing, grooming, dressing, transferring, incontinence care, preparing meals, being alone, telephoning, managing money, routine health care tasks (or those health care tasks not requiring specialized training), specialized health care tasks (or those requiring assistance from trained medical practitioners), necessary travel outside the home, laundry, and housework." 89

Ill. Adm. § 679.30(b) (2007). Once an individual's impairments are ascertained, a service plan will be created that "include[s] the type of service(s) to be provided to the customer, the specific tasks involved, the frequency with which the specific tasks are to be provided, the number of hours each task is to be provided per month, [and] the rate of payment for the service(s)." 89 Ill. Adm. Code § 684.50 (1999). Ultimately, the services that will be provided to those who qualify for the Program's assistance are those that are "necessary to meet an unmet care need of the individual." 89 Ill. Adm. Code § 684.10(a) (2014). In addition to being necessary to meet an individual's needs, those services must also be "safe and adequate," "cost effective" and "the most economical in terms of the customer's needs." 89 Ill. Adm. Code § 684.10(b)(1)-(3) (2014). Once an individual begins receiving Program services, he "must have eligibility [regularly] redetermined and must continue to meet all eligibility criteria" to continue to receive assistance from the Program. 89 Ill. Adm. Code § 682.400 (1999).

¶ 4        Jason was born on May 4, 1979, and was diagnosed with mental retardation when he was 2-years-old. He is unable to speak and also suffers from an enlarged heart, high blood pressure, high cholesterol, and diabetes. In addition, Jason has poor eyesight, which is a side effect of his diabetes. Jason first began receiving assistance from the Program in 2003. Since then, Jason has continued to have his needs reassessed and has continued to receive personal assistance hours. He resides in an apartment with his mother, who has been designated his personal assistant under the Program. As Jason's personal assistant, his mother is the individual primarily responsible for ensuring that Jason's needs with respect to the 15 aforementioned ADLs are met. Jason's father, sister, and brother reside in a different nearby residence. Jason's brother is also a recipient of HSP services and his mother also serves as his brother's personal assistant.

¶ 5       Jason's most recent assessment was performed by Julie Malone, a counselor from the Department's Division of Rehabilitative Services (DRS) on April 22, 2011.[1]  During the reassessment, Malone interviewed Jason's parents, and based upon the information that she obtained, Malone completed a DON assessment for Jason and reduced his personal service hours from 248 per month (approximately 8 hours per day) to 156.75 hours per month (approximately 5 hours per day).  The categories in which personal service hours were reduced included: bathing, grooming, laundry, time outside of the home, routine health care, and being alone. Specifically, bathing was reduced from 31 hours to 14.25 hours, grooming was reduced from 22.5 hours to 10 hours, time outside of the home was reduced from 20 hours to 15 hours, routine health care was reduced from 15.5 hours to 7.75 hours, and being alone was reduced from 23.25 hours to 0 hours.[2]  The reduction in Jason's personal service hours in those areas was based upon Malone's conclusion that "the previous service plan exceeded the number of hours necessary to meet an unmet care of need."  Malone, however, did add personal service hours in the category of "telephoning." Jason's personal service hours in the other categories remained unchanged.[3] On June 3, 2011, after being notified of the reduction in Jason's personal service hours, Hanks, Sr., requested an administrative hearing.  That hearing was conducted on April 10, 2012.

¶ 6       Jason's father and Malone both participated in the hearing.  Jason's mother, who acted as his personal assistant and performed the majority of the tasks necessary to care for her son, elected not to participate in the hearing.  At the hearing, Malone testified that she did not look at

---

[1]  Jason's prior reassessment took place in April 2009.

[2] With respect to the category of being alone, the Department concluded that it had erred in allocating personal service hours in this category during previous assessments. During the hearing, a Department official explained that this category is designed to provide a customer with the resources to hire a second personal assistant to relieve his primary personal assistant if it was necessary to do so.  Because Jason had never hired a second assistant and had no need for one, it was the Department's position that previous allotments of personal service hours in this category were incorrect.

[3] Jason was allocated .25 hours 10 days per month for telephoning.  The areas in which Jason's personal service hours remained unchanged included: eating, dressing, transferring, incontinence, managing money, preparing meals, housework, and special health.

previous home service plans completed for Jason because prior plans have no bearing on the amount of services allocated to an individual following a new assessment. She further testified that the conclusions that she reached during the assessment were primarily based on the information that Jason's mother, who was very familiar with her son's limitations and his daily needs, provided to her during the four hour reassessment. For example, Malone explained that she reduced the number of hours allocated to the category of bathing based on Jason's mother's representation that she bathed her son every other day rather than every day, which is what had been reported in 2009 assessment. In contrast, Malone testified that Jason's father was hesitant in his responses and did not seem as knowledgeable of the time it took to fulfill Jason's needs. For example, although he testified that his son was shaved every day, Malone noticed that Jason had a full beard at the time of the reassessment. Jason's father, in turn, testified at the hearing that Malone's account of his wife's time estimates were inaccurate and provided his own estimates even though he conceded he was not the individual who performed those tasks. However, he reported that he was familiar with his son's needs and the time required to meet those needs because he spent four to six hours with his son daily.

¶ 7    On June 29, 2012, following the hearing, the Department issued a revised decision (Post-Hearing Decision) in which it denied Jason's request to return his monthly personal service hours to 248, but increased his personal service hours to 167 per month. In doing so, the Department found that the overall reduction in personal service hours in the categories pertaining to bathing and grooming was correct, but that the amounts of the reductions were incorrect because they "did not adequately provide for the Customer's needs." Accordingly, based on the testimony that the Department considered, personal service hours for bathing were increased to 23.25 hours per

month and personal service hours allocated to the area of grooming were increased to 15.50 hours per month. The other categories remained unchanged.

¶ 8    On July 27, 2012, after reviewing the Department's Post-Hearing Decision, Hanks, Sr., on behalf of his son, filed a complaint for administrative review in the circuit court. He argued that the reduction in Jason's personal service hours was "erroneous and contrary to law" because there was no evidence that his medical condition or access to resources had changed.

¶ 9    On January 29, 2013, the circuit court issued a written order affirming the Department's allocation of personal service hours in the areas of bathing, preparing meals, laundry, being alone, telephoning, eating, dressing, transferring, incontinence, housework, and special health. The court, however, remanded the matter back to the Department and ordered the Department to make additional findings in other specified areas. The court's order, in pertinent part, provided:

> "a. Grooming:  The Court Remands for the Hearing Officer to articulate the measures used to reaching the decision to award 15.50 hours per month for grooming.
>
> b. Managing Money:   The Court remands for the Hearing Officer to articulate the statutory criteria used to award zero hours per month for managing money;
>
> c. Outside Home:  The Court reverses the Hearing Officer[']s decision that there was no medical support for awarding in this category and remands for the Hearing Officer to make a ruling in this area;
>
> d. Routine Health:  The Court remands for the Hearing Officer to articulate the reason for discontinuing home services hours for measuring and regulating [Jason's] blood pressure and sugar levels."

In its order, the court also indicated that the Hearing Officer was "free to take additional evidence if the Hearing Officer determines that is necessary, but that is not required."

¶ 10    On March 19, 2013, following the circuit court's remand, the Department issued its final administrative decision (Final Decision) in which it reviewed the categories specified in the remand order and explained its rationale concerning the allocation of personal service hours in those categories. With respect to the area of grooming, the Department adhered to its decision to award Jason 15.50 hours per month, the amount that it had determined to be appropriate in its Post-Hearing Decision, explaining:

"Prior to the [2011] DRS assessment, the Customer had been receiving 0.25 hours per day for 31 days per month, 2.00 hours per day for 10 days per month, and 1.00 hour per day for 15 days per month for a total of 42.75 hours per day in the area of grooming. During the reassessment, the Customer's Mother/Personal Assistant stated to the DRS Counselor that the Customer was unable to shampoo, comb, shave, trim his fingernails and toenails, and brush his teeth. During the Appeal Hearing, the Father/Representative stated that the Customer needed assistance with washing his hair daily and with trimming his fingernails and toenails every three days. The Father/Representative confirmed that he was available to provide assistance with shaving when needed. The Mother/Personal Assistant assisted the Customer with his grooming needs and provided the DRS Counselor with an explanation of those tasks during the reassessment. The Father/Representative was present at the reassessment, but the DRS Counselor noted the Mother/Personal Assistant's statements because she assisted the Customer with his grooming needs. I find that the Father/Representative's testimony at the appeal hearing constituted an attempt to improperly inflate the level of the Customer's impairment at the time of the reassessment and therefore, the Father/Representative was not credible. In considering the DRS assessment and the testimony taken at the hearing, I do find that the

amount of the reduction by DRS to 0.75 hours per day for 19 months was incorrect because it does not adequately provide for the Customer's grooming needs. While I find 42.75 hours per month in the area of grooming only to be excessive, I find that it is reasonable to allocate 15 minutes per day for 31 days per month (7.75 hours per month) for assistance with brushing his teeth every day, 15 minutes per day for 8 days per month (2.00 hours per month) for assistance with trimming his fingernails and toenails because the Customer's fingernails and toenails do not need daily care, and 15 minutes per day for 23 days per month (5.75 hours per month) for assistance with washing his hair because the Mother/Personal Assistant's statements to the DRS Counselor did not indicate a need for daily shampooing of the Customer's hair for a total of 15.50 hours per month in the area of grooming. Therefore, this revised plan structure is necessary to meet an unmet care need of the Customer and 15.50 hours per month in the area of grooming is safe and adequate, cost effective, and the most economical in terms of his needs."

¶ 11    With respect to the category of routine health, the Department increased the amount of hours allocated to this category from 7.75 hours per month, the amount contained in its Post-Hearing Decision, to 11.50 hours per month. The Department explained its decision as follows:

"Prior to the [2011] DRS reassessment, the Customer had been receiving 0.50 hours per day for 31 days per month (15.50 hours per month). During the reassessment, the Customer's Mother/Personal Assistant told the DRS Counselor that he needed reminders to take his medications. There are no statements in the DRS reassessment concerning the monitoring of the Customer's blood sugar level and blood pressure. The Father/Representative testified at the appeal hearing that the Customer needed assistance with checking his blood sugar level and blood pressure using automatic meters. I find

that the Father/Representative's testimony constituted an attempt to improperly inflate the level of the Customer's impairment at the time of the reassessment and was not credible. However, I find that it is reasonable to allocate 0.25 hours per day for 31 days per month (7.75 hours per month) because the Customer does need assistance with the monitoring of his blood sugar level and his blood pressure. I also find it reasonable to allocate 0.25 hours per day for 15 days per month (3.75 hours) during those times when the Customer experiences some difficulty with remembering to take his medication. Therefore, the revised plan structure is necessary to meet the Customer's unmet need for monitoring his blood sugar levels and blood pressure and reminders to take his medication; and 11.50 hours per month in the area of routine health is necessary to meet the Customer's unmet care need and these services are safe and adequate, cost effective, and the most economical in terms of the customer's needs."

¶ 12     The Department also elected to increase the number of personal service hours allocated to the category of time outside of the home. In this category, the 15.50 hours allocated in the Post-Hearing Decision were increased to 20.50 hours per month. The Department explained its decision as follows:

"Prior to the [2011] DRS reassessment, the [Customer] had received 2.00 hours per day for 10 days (20.00 hours per month). In a subsequent review of the record, I note that the [Customer] submitted three letters from medical providers in support of his need for HSP services: In a letter dated April 16, 2011, Angelo J. Babbo, DO states that the [Customer] 'requires assistance in all of his activities of daily living and therefore needs the maximum amount of time to provide for his needs' which 'include[s]…transport to and from doctors visits.' In an amendment dated April 29, 2011, Angelo J. Babbo, DO

notes that the [Customer] 'requires daily walks as well accompanied at all times by one or another of his parents.' In letters dated August 8, 2007 and May 14, 2009, Hugo H. Muriel, M.D., F.A.C.E. states that the [Customer] 'has to be assisted almost with everything in his life, therefore, he needs the maximum allow[ance] of time to provide for his needs' which include[d] someone to 'bring him to his doctor's appointments.' The DRS assessment does not reflect any statements by the Mother/Personal Assistant concerning one-hour daily walks with the [Customer]. At the appeal hearing the Father/Representative testified that he provides transportation, takes the Customer to the doctor and handles emergencies. The Father/Representative testified that the [Customer] took daily walks for one hour, however, he did not accompany the [Customer] during the walks. I find that the Father/Representative's testimony at the appeal hearing constituted an attempt to improperly inflate the level of the [Customer's] impairment at the time of the reassessment and therefore, the Father/Representative was not credible. As the Father/Representative was an available resource to assist the [Customer's] necessary travel outside [the] home for medical appointments, picking up prescriptions, and providing transportation, and as Dr. Babbo's amendment does not specify the length of time medically required for the [Customer's] daily walks, I find that it is reasonable to allocate 0.50 hours per day for 31 days per month (15.50) hours per month for the [Customer's] daily walks in the area of necessary travel outside the home. See 89 Ill. Adm. Code § 679.30(b). I also find that it is reasonable to allocate 1.00 hour per day for 5 days per month (5.00 hours per month) for necessary travel such as medical appointments. Therefore, the proposed plan structure is necessary to meet an unmet care

need of the Customer and 20.50 hours per month in the area of outside home is safe and adequate, cost effective, and the most economical in terms of the [C]ustomer's needs."

¶ 13     With respect to the final disputed category of managing money, the Department elected to increase the hours allocated to this category from 0 hours to 2.50 hours per month and explained its decision as follows:

"During the [2011] reassessment, the Mother/Personal Assistant told the DRS Counselor that the Customer lacked the cognitive ability to manage money, budget and pay bills. The Father/Representative testified that the Mother/Personal Assistant is the representative payee for the Customer and that the Customer does receive unearned income from the Social Security Administration. I find that the Father/Representative's testimony constituted an attempt to improperly inflate the level of the Customer's impairment at the time of the reassessment. However, as the Customer does lack the cognitive ability to manage money, and the DRS Counselor testified at the appeal hearing that DRS allows hours if there are bills to be paid on a monthly basis, I find it is reasonable to allocate .50 hours per day for 5.00 days per month (2.50 hours per month) in the area of managing money. I find that 2.50 hours per month is adequate because the Customer lives with his mother in an apartment and does not live alone. Therefore, the revised plan structure is necessary to meet the Customer's unmet care need for paying bills and 2.50 hours per month in the area of managing money is necessary to meet the Customer's unmet care needs and these services are safe and adequate, cost effective, and the most economical in terms of the [C]ustomer's needs."

¶ 14	After the Department submitted its Final Decision, Hanks, Sr., again challenged the Department's allocation of personal service hours in the circuit court. After reviewing the Department's Final Decision, the circuit court held:

> "The court finds that the remanded final administrative decision failed to articulate 2 bas[e]s for the awarding of hours in the 4 disputed areas. Therefore, the court reverses this decision in the areas of: grooming, managing money, outside of the home, and routine health. The court previously upheld IDHS regarding the other eleven areas. The hours allocated to grooming shall increase from 15.5 to 42.75 as determined in the 4-28-10 assessment; managing money shall decrease from 2.5 to 0; the areas of outside the home shall decrease from 20.5 to 20.0; the area of routine health shall increase from 11.5 to 15.5, all in accordance with the 4-28-10 assessment. The total number of hours shall increase from 178.75 found in the 3-19-13 decision to 206.75 per this order."

¶ 15	This appeal followed.

¶ 16	ANALYSIS

¶ 17	On appeal, the Department and its director argue that the circuit court improperly undertook its own review of the facts and made its own credibility determinations in violation of the well-settled principles of administrative review law. Defendants further argue that the Department's final administrative decision "properly balanced [Jason's] unmet care needs with the need to preserve scarce public resources" and urge this court to reinstate its Final Decision.

¶ 18	Hanks, Sr., in turn, responds that the "Department's decision to reduce the number of hours allotted for [Jason's] care, where there was neither improvement in his medical condition, nor an increase in the availability of a legally responsible person to take care of him, was arbitrary and capricious, and contrary to law." Accordingly, because the Department's decision

"lacked any discernible rationale," he argues that the circuit court properly reversed the Department's decision to reduce the amount of care to which he was entitled.

¶ 19    Appeals from administrative hearings are governed by the Administrative Review Law. 735 ILCS 5/3-101 (West 2012); *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 385 (2010). On appeal from a circuit court's judgment on administrative review, a reviewing court reviews the decision of the agency, not the circuit court. *Provena Covenant Medical Center*, 236 Ill. 2d at 386; *Ramirez v. Andrade*, 372 Ill. App. 3d 68, 73 (2007). In reviewing an administrative agency's decision, the applicable standard of review depends upon the type of question raised on appeal. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008); *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). An administrative agency's factual findings and credibility determinations are deemed *prima facie* true and correct and a reviewing court is limited to ascertaining whether those findings are against the manifest weight of the evidence. *Cinkus*, 228 Ill. 2d at 210; *City of Belvidere*, 181 Ill. 2d at 205. A finding is against the manifest weight of the evidence if " 'the opposite conclusion is clearly evident' " or if the finding is " 'unreasonable, arbitrary, and not based upon any of the evidence.' " *Lyon v. Department of Children & Family Services*, 209 Ill. 2d 264, 271 (2004) (quoting *Snelson v. Kamm*, 204 Ill. 2d 1, 35 (2003)). The mere fact that the agency could have ruled differently is not reason to reverse the administrative agency's findings; rather, as long as there is evidence in the record that supports the agency's decision, it should be upheld on appeal. *Robbins v. Board of Trustees of the Carbondale Police Pension Fund of the City of Carbondale, Illinois*, 177 Ill. 2d 533, 538 (1997). An administrative agency's conclusions regarding questions of law, in contrast, are not subject to deference; rather, the court's review is independent and not deferential. *Cinkus*, 228 Ill. 2d at 211; *City of*

*Belvidere*, 181 Ill. 2d at 205. Finally, an administrative agency's determinations regarding mixed questions of fact and law, that is, questions involving the examination of the legal effect of a given set of facts, are subject to an intermediate clearly erroneous standard of review. *City of Belvidere*, 181 Ill. 2d at 205. An administrative agency's decision on an issue involving a mixed question of fact and law will only be deemed clearly erroneous where the reviewing court, after reviewing the record, is " 'left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). In this case, the Department's determination as to Jason's need and eligibility for Program benefits involves a mixed question of fact and law, and as such, the Department's conclusions will not be reversed unless they are clearly erroneous. See, *e.g.*, *Biekert v. Maram*, 388 Ill. App. 3d 1114, 1123 (2009) (administrative agency's decision as to whether a plaintiff's condition qualified him for Medicaid services was an issue of mixed fact and law and would not be reversed unless it was clearly erroneous). Keeping this standard in mind, we turn now to evaluate the Department's allocation of personal service hours in the four ADL categories of grooming, routine health, time outside of the home, and managing money.

¶ 20    Turning first to the category of grooming, the Department argues that the 15.50 hours per month allocated to Jason's grooming needs was not clearly erroneous, whereas Hanks, Sr., argues that the circuit court correctly held that 42.75 hours per month was the amount necessary to satisfy Jason's needs in this category. We agree with the Department. In its Final Decision, the Department observed that there were timing discrepancies between the estimates provided by Jason's mother and father with respect to Jason's grooming needs. For example, Jason's mother told DRS counselor Malone that she washed her son's hair every other day and estimated that

grooming her son took approximately 45 minutes per day. In contrast, Hanks Sr. testified at the administrative hearing that Jason needed his hair washed daily and estimated that it took approximately 80 minutes per day to groom him. In making its final determination as to the number of personal service hours to which Jason was entitled in this category, the Department relied heavily on the time estimates provided by Jason's mother, as she was his personal assistant and was most familiar with her son's needs as well as the necessary time it took her to meet those needs and found the estimates provided by Hanks Sr. to be "not credible." After determining the weight to afford to the testimony of Jason's parents, the Department "found it reasonable to allocate 15 minutes per day for 31 days per month (7.75 hours per month) for assistance with brushing his teeth every day, 15 minutes per day for 8 days per month (2.00 hours per month) for assistance with trimming his fingernails and toenails *** , and 15 minutes per day for 23 days per month 5.75 hours per month for assistance with washing his hair *** for a total of 15.50 hours per month in the area of grooming." We reiterate that it is not this court's role to reevaluate witness credibility or reweigh conflicting evidence and conclude that the Department's credibility determinations were not against the manifest weight of the evidence. *Cinkus*, 228 Ill. 2d at 210. We further conclude that the 15.50 hours per month that the Department allocated to the category of grooming was not clearly erroneous.

¶ 21     We turn next to the Department's allotment of 11.50 personal service hours per month for the category of routine health. In its Final Decision, the Department reviewed testimony provided by Jason's parents as well as Malone. The Department noted that Jason's mother had reported that her son was required to take several medications daily and that he did not have the cognitive ability to remember to do so absent reminders. As such, the Department found it appropriate to allot 3.75 hours per month (or .25 hours per day for 15 days) for "those times

when the Customer experiences some difficulty with remembering to take his medication." The Department also found it reasonable to allocate an additional 7.75 hours per month for the monitoring of Jason's blood pressure and blood sugar levels. In doing so, the Department noted that Jason's mother had not mentioned needing to assist her son in monitoring his blood pressure and blood sugar levels, but acknowledged that Jason's father testified that Jason did require daily monitoring and estimated that it took his wife 30 minutes each day to monitor Jason's blood sugar and 10 to 15 minutes each day to check Jason's blood pressure. Although the Department found the time estimates provided by Hanks Sr. to be "inflate[d]," it nonetheless found it appropriate to allocate 0.25 hours per day for 31 days per month to ensure that Jason's routine health care needs were met. Because it is evident from the record that the Department's allotment of personal service hours was based on its careful consideration of Jason's needs, its determination was not clearly erroneous and the circuit court thus erred in reversing the Department's decision.

¶ 22    With respect to the category of time outside of the home,[4] the record shows that the Department based its decision to allot 20.50 hours per month on information provided by Jason's doctors and parents. Specifically, the Department reviewed two letters written by Doctor Angelo Babbo, wherein the doctor relayed that Jason needed "assistance in all of his activities of daily living" including "transport to and from doctor's visits" and indicated that Jason required "daily walks" accompanied by one of his parents. After reviewing Doctor Babbo's letters, the Department noted that the letters did "not specify the length of time medically required for

---

[4] We note that Hanks, Sr., indicated in his brief, that he "does not oppose reversal of the circuit court's decision" with respect to the categories of time outside of the home and managing money since the court's order had the effect of decreasing the hours that the Department allotted for both categories. Notwithstanding the parties' agreement that the circuit court erred with respect to these categories, this court must conduct its own independent review of the Department's allocation of personal service hours in these categories. See *Provena Covenant Medical Center*, 236 Ill. 2d at 386 (in administrative review actions, a reviewing court reviewing court reviews the decision of the agency, not the circuit court).

[Jason's] daily walks," and concluded that it was reasonable to allocate 15.50 hours per month (or "0.50 hours per day for 31 days") for his walks. In doing so, the Department acknowledged that Jason's father had reported that his son's daily walks lasted one hour, but noted that his father did not accompany his son on his walks and concluded that his testimony constituted an attempt to improperly inflate Jason's needs. In contrast, the Department concluded that Hanks, Sr., testified credibly that he helped transport his son to medical appointments. Accordingly, the Department "found it reasonable to allocate 1.00 hour per day for 5 days per month ([an additional] 5.00 hours per month) for necessary travel such as medical appointments." After reviewing the record, it is evident that the Department's determination was based on its consideration of Jason's needs and impairments in this category and we do not find that its conclusion was clearly erroneous.

¶ 23     We turn now to the final category of managing money. Prior to the Department's Final Decision, Jason had never received any personal assistance hours in this category. The record, however, reveals that the Department's decision to allocate personal service hours to this category was based upon testimony from Jason's parents that he received social security payments and had medical bills but lacked the cognitive ability to manage money and pay bills as well as testimony from Malone that the Program permits hours in this category if there are bills to be paid on a monthly basis. Following our review of the record, we do not find the Department's decision to allocate 2.5 monthly hours to the category of managing money was clearly erroneous.

¶ 24     After reviewing the aforementioned categories, we emphasize that the clearly erroneous standard is one that is "largely deferential to the agency decision." *Chicago Messenger Service v. Jordan*, 356 Ill. App. 3d 101, 106-07 (2005). Although one could potentially come to different

conclusions regarding the allocation of personal service hours in this case, that does not make the Department's Final Decision clearly erroneous. It is evident from the record that the decrease in Jason's personal service hours was not arbitrary, but was based on the Department's consideration of the testimonial and documentary evidence. Because this court has not been left with a firm and definite conviction that a mistake has been made, we conclude that the circuit court erred in reversing the Department's Final Decision.

¶ 25    In doing so, we necessarily reject Hanks, Sr.'s, argument that the overall reduction in his son's personal service hours was arbitrary, and thus, unconstitutional. We note that he provides no relevant controlling authority to support his contention that the allotment of benefits under the Illinois Home Services Program is constitutionally infirm. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013). Moreover, we note that the Program does not, as Hanks, Sr., contends, leave counselors with "unfettered discretion" to reduce Program recipient benefits. Rather, as set forth above, the Administrative Code requires counselors to utilize a determination of need (DON) assessment tool to determine an individual's degree of impairment and need for assistance, which is then utilized to create a service plan specifically tailored to that individual. 89 Ill. Adm. Code §§ 679.10 (2015); 679.30(b) (2007); 684.50 (1999). Accordingly, we reject Hanks, Sr.'s, argument that the reduction of his son's benefits failed to meet basic standards of reasonableness and fairness and uphold the Department's Final Decision.

¶ 26                                CONCLUSION

¶ 27    Accordingly, the judgment of the circuit court is reversed.

¶ 28    Reversed.