# Illinois Official Reports

## Appellate Court

> ### *University of Chicago v. Department of Revenue*, 2020 IL App (1st) 191195

| | |
|---|---|
| Appellate Court Caption | THE UNIVERSITY OF CHICAGO, an Illinois Not-for-Profit Corporation, and BRIGHT HORIZONS CHILDREN'S CENTERS, LLC, a Delaware Limited Liability Company, Plaintiffs-Appellees, v. THE DEPARTMENT OF REVENUE; CONSTANCE BEARD, in Her Official Capacity as Director of Revenue; and THE COOK COUNTY BOARD OF REVIEW, Defendants (The Department of Revenue and Constance Beard, in Her Official Capacity as Director of Revenue, Defendants-Appellants). |
| District & No. | First District, Sixth Division<br>No. 1-19-1195 |
| Filed | May 15, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 18-L-50641; the Hon. Michael F. Otto, Judge, presiding. |
| Judgment | Circuit court judgment reversed.<br>Department decision affirmed. |
| Counsel on Appeal | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Aaron T. Dozeman, Assistant Attorney General, of counsel), for appellants.<br><br>Thomas J. McNulty, Steven F. Pflaum, and Nicholas S. Graber, of Neal, Gerber & Eisenberg LLP, of Chicago, for appellees. |

| Panel | JUSTICE CONNORS delivered the judgment of the court, with opinion. |
|---|---|
| | Justices Cunningham and Harris concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendants, the Department of Revenue (Department) and its director, appeal from the circuit court's order reversing the Department's decision that plaintiffs, the University of Chicago (University) and Bright Horizons Children's Centers, LLC (Bright Horizons) (sometimes referred to as "applicants"), were not entitled to property tax exemptions under section 15-35 of the Property Tax Code (Code) (35 ILCS 200/15-35 (West 2016)). On appeal, the Department contends that it properly determined that two on-campus daycares run by Bright Horizons were not reasonably necessary for fulfilling the University's educational objectives and that Bright Horizons operates with a view to profit. The University and Bright Horizons maintain that (1) the University is entitled to an exemption under section 15-35 of the Code because its use of the subject properties for daycare facilities was "reasonably necessary" for the accomplishment of the educational objectives or the efficient administration of the University and (2) the Department erred as a matter of law in denying the exemption applications on the ground that Bright Horizons used the subject properties with a view to profit, where the University did not receive any profit by outsourcing the operation of the daycare facilities to Bright Horizons. We agree with the Department and reverse the circuit court.

¶ 2                                    I. BACKGROUND

¶ 3    The University, an Illinois not-for-profit corporation, and Bright Horizons, a Delaware limited liability company that is registered to do business in Illinois, sought a tax exemption for tax year 2015 for the two subject properties—5610 South Drexel Avenue (Drexel) and 5824 South Stony Island Avenue (Stony Island). The University had outsourced the operation of its daycare facilities at Drexel and Stony Island to Bright Horizons through a child care center development and sponsorship agreement (agreement). The applicants sought property tax exemptions pursuant to section 15-35 of the Code. *Id.* Section 15-35 of the Code provides in pertinent part:

> "All property donated by the United States for school purposes, and all property of schools, not sold or leased or otherwise used with a view to profit, is exempt, whether owned by a resident or non-resident of this State or by a corporation incorporated in any state of the United States." *Id.*

¶ 4    On October 17, 2016, the Department denied the University's and Bright Horizons's exemption applications. In its denial, the Department stated that the applications were denied because the properties were not "in exempt ownership and exempt use" and that Bright Horizons had "no ownership interest in the property."

¶ 5    The University and Bright Horizons filed a request for a hearing under section 8-35(b) of the Code (*id.* § 8-35(b)). The hearing was held on May 11, 2017, before Administrative Law Judge (ALJ) Kenneth Galvin. The University and Bright Horizons called three witnesses:

Ingrid Gould, Shirley Neiman, and Jocelyn Miller. The Department did not call any witnesses. The testimony presented was as follows.

¶ 6        Ingrid Gould, the associate provost for faculty affairs at the University, testified that she was responsible for overseeing the University's childcare programs. When she came to the provost's office in 2004, she was told "we need to do something about childcare, but we are not ready to have it on campus." Gould stated that she found area providers and created partnerships with them. However, there were groups on campus that began pressing for on-site childcare. As time went on, the University became an outlier amongst its peers in terms of childcare. Gould testified that when the University would recruit an associate professor or a full-time professor, "they would come to us from an institution where there had been childcare and where they had benefitted from childcare, and so they were stunned to take what they thought was a better job at a better institution, and to find that we didn't have this amenity." She stated that there were "assistant professors or post docs who were coming to us saying, well, when we were graduate students, we had on-site childcare."

¶ 7        Gould stated that in 2010, the provost told her to make a proposal for on-site childcare. Gould designed a survey with her colleague that was sent to all employees, both academic and nonacademic. The survey revealed that 95 percent of staff were interested in childcare on campus. The greatest demand was for infant and toddler care, and people wanted reliability and priority enrollment for the University community. They wanted to be sure that the hours would suit their needs so that they could focus on their work. They also cared about proximity, which was why on-site childcare was so important.

¶ 8        The University ultimately selected Bright Horizons as its daycare provider. University families had priority for admission, and community members were welcome to enroll in any leftover spots, as part of the University's efforts to be a "good neighbor." University families included children of faculty members, academic appointees, lecturers, researchers, and someone "who is just doing clinical work for us."

¶ 9        Gould testified that Bright Horizons does not pay the University rent. The University does not collect any money from Bright Horizons. The University paid for the build-out and the construction of the daycare facilities on campus.

¶ 10       When asked about how the partnership with Bright Horizons promoted and assisted the University in achieving its educational and research goals, Gould stated:

> "[W]hat parents have said to us for years is that they want to focus on their work, and, of course, that's what we want them to focus on. So having onsite care, especially for infants, means that mothers can be at the head of a classroom, they can be in a clinic, they can be in their lab, and they can dart over and feed a child and run right back. It means they are working 110 percent the way we want them to be all the time, knowing that their kids are being taken care of right nearby on campus. The hours are extensive, far more than we would ask for people to be working onsite. [The daycares] are open 11 hours a day. It allows for them to stay for a late meeting and know that if there is any problem, they are just a few blocks away and that their kids are in competent hands so they can really dedicate themselves, as we want them to, to their jobs."

¶ 11       Shirley Neiman, the director of the Bright Horizons on Drexel, testified that the University was responsible for the exterior of the building, the heating and air conditioning, and the locks of the daycare facilities. Bright Horizons does not pay the University rent or a management

fee, but pays the University $955.25 monthly for snow removal or grass cutting, depending on the season. The University does not get any part of the tuition paid to Bright Horizons.

¶ 12     Neiman testified that 93 percent of the participating children who attended the Drexel Bright Horizons in 2015 had parents that were University-affiliated. The Drexel location operated at a profit of $495,000 in 2015.

¶ 13     Jocelyn Miller, the regional manager for Bright Horizons, testified that Bright Horizons does not pay the University a management fee. She testified that the University has no control over the tuition rates of the daycare facilities. Miller testified that 83% of the enrollment at the Stony Island location was University-affiliated, and 18 percent was community families.

¶ 14     The exhibits showed that Stony Island operated at a profit of $444,535 in 2015. The exhibits also showed that Drexel offered enrollment for up to 124 children, 6 weeks old to 5 years old. At the time of the hearing, Drexel had 124 children enrolled, 105 of which were children of University employees and 19 of which were children from the Hyde Park/Chicago community. Stony Island offered enrollment of up to 122 children. At the time of the hearing, 119 children were enrolled, 94 of which were children of University employees and 25 of which were from the Hyde Park/Chicago community.

¶ 15     ALJ Galvin retired before issuing a recommendation in this case. On September 29, 2017, ALJ Kelly Yi, who did not attend the hearing, but reviewed all submissions and testimony, issued a recommendation for disposition. The ALJ found as a preliminary matter that both applicants had standing. The University was the owner of the properties in question, and Bright Horizons, pursuant to an operating agreement, was obligated to pay real estate taxes on the subject property.

¶ 16     The ALJ then found that the applicants had not provided—by the presentation of testimony, exhibits, and argument—"evidence sufficient to warrant exempting the subject property from property taxes for tax year 2015." The ALJ stated that the applicants "presented no evidence there was an actual shortage of quality daycare in the community prior to [a]pplicants building and operating onsite daycare" and found that, prior to opening Bright Horizons, the area childcare providers had agreed to set aside some spaces for University employees. The ALJ stated, "no testimony or documentary evidence was presented that the shortage of quality care continued after the University formed partnerships with area daycare providers." There was no governmental obligation to provide top tier education or subsidize through property tax exemption ancillary services based on employee demand.

¶ 17     Finally, the ALJ found that the subject properties were used with a view to profit and, therefore, could not be exempt from property taxes in 2015. The ALJ supported this conclusion with the fact that Bright Horizons, a for-profit corporation, made profits of approximately $940,000 during an unidentified period of time.[1]

¶ 18     On August 16, 2018, the director of the Department accepted the recommendation of the ALJ and denied the University's and Bright Horizons' application for exemption.

¶ 19     The University and Bright Horizons timely filed a complaint for administrative review in the circuit court. The parties submitted briefs, and a hearing was held. The circuit court then issued a memorandum opinion and order reversing the Department's decision.

---

[1]We note that Neiman testified that the exhibit containing Drexel's and Stony Island's net incomes was based on the year 2015.

¶ 20    The court found that the property in question was not "used with a view to profit" within the meaning of section 15-35 of the Code, regardless of the fact that the occupant itself, Bright Horizons, earned a profit from its operations on the property that satisfied the school's needs. The court focused on whether the owner profited, not the occupant of the building.

¶ 21    In addressing the issue of whether the property was used for school purposes, the court noted that the test is whether "the property is primarily used for purposes which are reasonably necessary for the accomplishment and fulfillment of the educational objectives, or efficient administration, of that particular institution." The analysis must center on the needs of the particular institution, and some discretion must be given to the governing authorities of the institution to determine what buildings are necessary or proper to further their educational objectives. The court found that, in this case, the ALJ did not extend any deference "whatsoever" to the University's determination that on-campus childcare was reasonably necessary. The court held that the ALJ's conclusion that on-campus childcare cannot be "necessary" unless there is a total absence of off-campus childcare was "absurd." There was nothing in the case law that suggested on-site childcare was unnecessary so long as off-site facilities existed. Rather, it was just one factor to consider.

¶ 22    The court found that affording even a minimal degree of deference to the University's determination compelled the conclusion that childcare facilities were reasonably necessary for the accomplishment and fulfilment of the educational objectives, or efficient administration, of the University. The court concluded that the properties were tax exempt, and the Department now appeals.

¶ 23                                    II. ANALYSIS

¶ 24    A Department decision that denies an application for a tax exemption is reviewable as a final administrative decision under the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2016)). 35 ILCS 200/8-40 (West 2016). In administrative review cases, this court's role is to review the decision of the administrative agency, not the decision of the circuit court. *Calvary Baptist Church of Tilton v. Department of Revenue*, 349 Ill. App. 3d 325, 330 (2004).

¶ 25    The general rule is that all property is subject to taxation unless specifically exempted by statute. *Eden Retirement Center, Inc. v. Department of Revenue*, 213 Ill. 2d 273, 285 (2004). Section 6 of article IX of the Illinois Constitution restricts the General Assembly's power to exempt. Ill. Const. 1970, art. IX, § 6. Permissible exemptions include "property used exclusively for agricultural and horticultural societies, and for school, religious, cemetery and charitable purposes." *Id.* Statutory exemptions are always construed narrowly and strictly in favor of taxation. *Swank v. Department of Revenue*, 336 Ill. App. 3d 851, 855 (2003). Moreover, the party claiming the benefit of exemption bears the burden of proving clearly and conclusively that it is entitled to the exception, and all facts and all debatable questions are resolved in favor of taxation. *Rogy's New Generation, Inc. v. Department of Revenue*, 318 Ill. App. 3d 765, 771 (2000).

¶ 26    The University and Bright Horizons claim they met their burden and were entitled to relief from taxation pursuant to section 15-35 of the Code, in which the General Assembly has granted a property tax exemption for property that is "donated by the United States for school purposes, and all property of schools, not sold or leased or otherwise used with a view to profit." 35 ILCS 200/15-35 (West 2016). Their first argument turns on whether the daycares

were used exclusively for school purposes.

¶ 27                              A. School Purposes

¶ 28        As an initial matter, the parties disagree on the applicable standard of review for this issue. Generally, when an administrative agency's decision involves a pure question of law, we review it *de novo*. *Skokie Firefighters Union, Local 3033 v. Illinois Labor Relations Board, State Panel*, 2016 IL App (1st) 152478, ¶ 11. When reviewing purely factual findings, the agency's findings and conclusions are deemed to be *prima facie* true and correct and, thus, are reviewed under a manifest weight of the evidence standard. 735 ILCS 5/3-110 (West 2016); *Skokie Firefighters Union, Local 3033*, 2016 IL App (1st) 152478, ¶ 11. When an agency's decision presents a mixed question of law and fact, it will be overturned on appeal only if it is clearly erroneous. *Village of North Riverside v. Boron*, 2016 IL App (1st) 152687, ¶ 14.

¶ 29        Here, we are presented with a situation where the ALJ was required to apply the law to a given set of facts. The University nevertheless contends that this is a challenge to the ALJ's interpretation of statutory provisions with undisputed facts and advocates for *de novo* review. However, the issue before the Department was whether the University met its burden to demonstrate that the on-campus daycares were tax exempt in 2015. That is the same issue on appeal. This case involves reviewing the parties' submissions, assessing the import of the facts submitted, putting the facts through a multi-part legal test, and deciding a fact-intensive question—whether the property is being used for school purposes. *Midwest Palliative Hospice & Care Center v. Beard*, 2019 IL App (1st) 181321, ¶ 19 (whether property being used for an exclusively charitable purpose is a mixed question of law and fact).

¶ 30        The ALJ was tasked with making a decision that turns on facts: whether this particular institution and the particular on-campus properties had the requisite factual bases to qualify for a statutory property tax exemption. Accordingly, we review the Department's decision to deny the property tax exemption under the clearly erroneous standard. *Id.* (Department's decision to deny a charitable property tax exemption is reviewed under the clearly erroneous standard); see also *Three Angels Broadcasting Network, Inc. v. Department of Revenue*, 381 Ill. App. 3d 679, 693 (2008) (the issue of whether, given the undisputed facts, the broadcasting network was entitled to a religious-use or charitable-use property exemption is reviewed under a clearly erroneous standard).

¶ 31        Each individual claim for tax exemption must be determined from the facts presented. *MacMurray College v. Wright*, 38 Ill. 2d 272, 278 (1967). A party seeking tax exemption for property that is exclusively used for school purposes must do more than "merely show that the property is owned by the school and occupied by school personnel." *Id.* The property must be used exclusively for school purposes. *Id.* "However, one is not required to show that the use of the property is absolutely indispensable for carrying out the work of the institution." *Id.* Our supreme court stated, "[e]xemption will be sustained if it is established that the property is primarily used for purposes which are reasonably necessary for the accomplishment and fulfillment of the educational objectives, or efficient administration, of the particular institution." *Id.*

¶ 32        We note that there are no Illinois cases that have determined whether a childcare center is reasonably necessary for the accomplishment and fulfillment of the education objectives or efficient administration of a school. However, as our supreme court has stated, "[i]t is recognized that a school's educational processes extend beyond the classroom and laboratory.

Accordingly, [Illinois courts] have held student dormitories, dining halls, and recreation facilities tax exempt as properly parts of the educational facilities of particular schools." *Id.* at 277-78 (citing *People ex rel. Goodman v. University of Illinois Foundation*, 388 Ill. 363 (1944), and *People ex rel. Hesterman v. North Central College*, 336 Ill. 263 (1929)).

¶ 33 Moreover, an Illinois court has applied the *MacMurray* test when analyzing whether a childcare center was reasonably necessary for the efficient operation of a charitable hospital under section 15-65. *Memorial Child Care v. Department of Revenue*, 238 Ill. App. 3d 985, 992-93 (1992); 35 ILCS 200/15-65 (West 2016) (certain property is exempt when exclusively used for charitable purposes). In *Memorial Child Care*, the plaintiff, Child Care, operated a childcare center on the land for the benefit of its affiliate, Memorial Medical Center. *Memorial Child Care*, 238 Ill. App. 3d at 986. Memorial Medical Center was an acute-care hospital located in Springfield, which had previously been granted a property tax exemption as a hospital operated for charitable purposes. *Id.* Child Care was a not-for-profit Illinois corporation that operated about one block west of the main hospital complex. *Id.* The Illinois Department of Revenue found the primary use of Child Care's property was neither charitable nor educational and denied the applications for exemptions. An administrative hearing was held. *Id.*

¶ 34 The following testimony was offered at the hearing. In the early 1980s, Memorial Medical Center conducted a survey because the hospital was experiencing some instability with its staff, especially in the nursing department. *Id.* at 987. The study determined that the young professional staff at the hospital had difficulty obtaining childcare due to a lack of adequate daycare facilities in the community. *Id.* Child Care was developed to provide a daycare facility that could correspond to the scheduling needs of the employees of the hospital. *Id.* Child Care's admission policy limited the enrollment to children of the employees of the affiliated corporations of the Memorial Medical Center System. *Id.* The fees charged by Child Care for daycare services were comparable to other facilities in the area. *Id.*

¶ 35 Testimony further revealed that because adequate childcare for hospital employees was not available in the community, the hospital needed to operate its own facility. *Id.* The biggest difference between Child Care and other daycare centers in the area was the hours of operation. Child Care was open from 5:30 a.m. until midnight, seven days per week. Child Care offered both a daily rate and a weekly rate and was used by approximately 140 employees. *Id.*

¶ 36 The ALJ recommended denial of the property tax exemptions, and the Department accepted the recommended disposition and denied Child Care's applications. *Id.* at 988. The Department rejected Child Care's argument that the daycare operation was reasonably necessary to fulfill the charitable objectives of Memorial Medical Center. *Id.*

¶ 37 Child Care filed a complaint for administrative review in the circuit court. *Id.* The circuit court reversed the decision of the Department, finding that the daycare was entitled to exemption from real estate taxes because its activities were "reasonably necessary" to further the charitable objectives of the hospital and to allow for the more efficient administration of the hospital. *Id.*

¶ 38 On appeal by the Department, the appellate court affirmed the circuit court. The court on appeal first noted that there "are no Illinois cases which have determined whether a child-care center is reasonably necessary for the efficient operation of a charitable hospital." *Id.* at 991. The court then noted that the record indicated a shortage of childcare facilities in the area and that employees of the hospital had difficulty finding childcare available that met their needs

and fit the hospital's scheduling requirements. *Id.* at 992. The court noted that Child Care was created specifically as a not-for-profit corporation to alleviate the difficulty the hospital experienced in hiring and maintaining employment of professional employees with young children. *Id.* at 993. The court stated, "[t]he use of the property at issue is for a purpose reasonably necessary to accomplish the efficient administration of Memorial Medical Center as a tax-exempt charitable hospital under the Act." *Id.* The court found that the facility enabled the hospital to better serve the needs of central Illinois "by allowing the hospital to attract and retain quality nurses and other medical professionals." *Id.* The court stated, "Although Memorial Medical Center functioned for years without a child-care center, this alone does not show that a child-care center for employees of the hospital is not essential to the operation of the hospital." *Id.*

¶ 39        The court found in that case that

> "the availability of secure, flexible child care is more than a mere convenience; it is a necessity that directly affects an employee's willingness and ability to provide much needed services to the Memorial Medical Center and the community. Child Care's use of the property is primarily for purposes reasonably necessary to accomplish the efficient administration of the hospital ***." *Id.*

¶ 40        In the case at bar, the Department contends that *Memorial Child Care* is inapposite because, in that case, there was a "documented lack of child care and a significant number of hospital employees had difficulty finding daycare that fit their schedules." The Department argues that the University and Bright Horizons, "put up no evidence that University-affiliated families had scheduling issues or other special, unique considerations that made on-campus daycare a necessity for them to carry out their educational duties." We disagree.

¶ 41        While it is the taxpayer's burden to prove its right to an exemption, each case requires consideration of the particular facts presented. *Norwegian American Hospital, Inc. v. Department of Revenue*, 210 Ill. App. 3d 318, 323 (1991). In the instant case, the University and Bright Horizons put forth evidence that the University had become an outlier amongst its peers in terms of childcare. When the University would recruit an associate professor or a full-time professor, the would-be employee would come from an institution where there had been childcare and was therefore surprised to take what they thought was a better job at a better institution, only to find that that the University did not have the same service.

¶ 42        In 2010, a survey was sent to all employees of the University, both academic and nonacademic. The survey showed that employees wanted reliability and hours that would suit their needs so that they could focus on their work. They also cared about proximity, which is why on-site childcare was so important. The survey revealed that 95% of staff and post docs were interested in childcare on campus. Gould testified:

> "[W]hat parents have said to us for years is that they want to focus on their work, and, of course, that's what we want them to focus on. So having onsite care, especially for infants, means that mothers can be at the head of a classroom, they can be in a clinic, they can be in their lab, and they can dart over and feed a child and run right back. It means they are working 110 percent the way we want them to be all the time, knowing that their kids are being taken care of right nearby on campus. The hours are extensive, far more than we would ask for people to be working onsite. [The daycares] are open 11 hours a day. It allows for them to stay for a late meeting and know that if there is

- 8 -

any problem, they are just a few blocks away and that their kids are in competent hands so they can really dedicate themselves, as we want them to, to their jobs."

¶ 43    As can be seen by this testimony, on-campus childcare was created specifically to alleviate the difficulty in hiring professional employees with young children. While there were other childcare facilities in the area, none were on campus. There is no question that on-campus childcare would enable the University to better serve the needs of the students at the University by allowing the University to attract and retain quality professors and other staff members. Although the University functioned for years without on-campus childcare, this alone does not show that a childcare center for employees of the University is not essential to the operation of the University. See *Memorial Child Care*, 238 Ill. App. 3d at 993 (while the hospital functioned for years without childcare, this alone does not show that a childcare center for employees of the hospital was not essential to the operation of the hospital). We agree with our colleagues in the Fourth District that the availability of secure, on-campus childcare is more than a mere convenience. *Id.* It is a necessity that directly affects an employee's willingness and ability to provide services for the University. *Id.*

¶ 44    We therefore find that the property at issue is primarily used for purposes that are reasonably necessary for the accomplishment and fulfillment of the educational objectives, or efficient administration, of the University. The Department's opposite conclusion was clearly erroneous. *Id.*; *MacMurray College*, 38 Ill. 2d at 277-78.

¶ 45                              B. Used With a View to Profit

¶ 46    Next, we must decide whether the subject properties are "used with a view to profit," within the meaning of section 15-35. 35 ILCS 200/15-35 (West 2016). The University and Bright Horizons contend that this phrase applies to the University as the owner of the property, and not the operator, and therefore the property is exempt because the University is not the entity profiting from the use of the property. The University does not collect rent from Bright Horizons and does not receive any portion of the tuition paid to Bright Horizons. The Department, on the other hand, contends that there is no basis in law to find that a profit must be made by the owner of the property for the tax exemption to be inapplicable. Rather, the Department contends that under the plain meaning of the statute, so long as the property is *used with a view to profit*, regardless of what entity profits, the exemption fails. The Department argues that because Bright Horizons made nearly $1 million in tuition in 2015, the property was used with a view to profit.

¶ 47    The issue here is one of statutory construction. Interpretation of a statute is a question of law. In cases involving an agency's interpretation of a statute that the agency is charged with administering, the agency's interpretation is considered relevant but not binding on the court. *Branson v. Department of Revenue*, 168 Ill. 2d 247, 254 (1995). Accordingly, our review of this issue is *de novo*, with some deference afforded to the Department's statutory interpretation. *Swank*, 336 Ill. App. 3d at 860. Our supreme court has specifically acknowledged the wisdom of judicial deference to an agency's experience and expertise. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 394 (2001). A significant reason for giving substantial weight and deference to an agency's interpretation of an ambiguous statute is that " 'agencies can make informed judgments upon the issues, based on their experience and expertise.' " *Id.* (quoting *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 97-98 (1992)).

¶ 48    We reiterate the general rule that all property is subject to taxation unless specifically exempted by statute, and we must construe the statutory exemption narrowly and strictly in favor of taxation. *Swank*, 336 Ill. App. 3d at 856. The primary rule of statutory construction is to give effect to legislative intent by first looking at the plain meaning of the language. *Davis v. Toshiba Machine Co., America*, 186 Ill. 2d 181, 184 (1999). Where the language is clear and unambiguous, a court must give it effect as written, without reading into it exceptions, limitations, or conditions that the legislature did not express. *Id.* at 184-85.

¶ 49    The language in section 15-35 reads, "All property donated by the United States for school purposes, and all property of schools, not sold or leased or otherwise used with a view to profit, is exempt ***." 35 ILCS 200/15-35 (West 2016). Accordingly, school property "cannot be 'sold' with a view to profit, 'leased' with a view to profit, or 'otherwise used with a view to profit.' " *Swank*, 336 Ill. App. 3d at 857. The Second District has found that the term "otherwise" refers to "all uses of the property 'with a view to profit' other than, or different from, selling or leasing it. This would include property devoted to school purposes, if used with a 'view to profit.' " *Id.* at 857-58.

¶ 50    The University and Bright Horizons rely on *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 392 (2010) for the proposition that outsourcing services to for-profit vendors does not affect entitlement to tax exemption. The specific passage they rely on reads as follows:

> "The fact that an organization contracts with third-party, for-profit providers for ancillary services does not, in itself, preclude the organization from being characterized as an institution of charity within the meaning of section 15-65 of the Property Tax Code ***. Virtually all charities must contract with for-profit vendors to one degree or another in order to carry on their operations and perform their charitable functions. [Citation.] The real concern is whether any portion of the money received by the organization is permitted to inure to the benefit of any private individual engaged in managing the organization. (Emphasis omitted.) *Id.*

¶ 51    However, *Provena* is inapposite, as it addressed whether an entity is still considered tax-exempt if it outsources some of its services. There is no question that the University is still a tax-exempt entity. Rather, the question remains as to whether, under section 15-35 of the Code, the profit must be realized by the owner of the property in order for the exemption to fail or if the provision applies to any entity making a profit on the property.

¶ 52    The circuit court found that "selling" and "leasing" property are activities engaged in by, and earning a profit for, the owner of the property. Citing *Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 492 (2009), the court stated that therefore, "under *ejusdem generis*, the catch-all 'otherwise used with a view to profit' should be read likewise as referring to activities profiting the owner." Under the *ejusdem generis* doctrine, "when a statutory clause specifically describes several classes of persons or things and then includes 'other persons or things,' the word 'other' is interpreted to mean 'other such like.' " *Id.*

¶ 53    In a vacuum, the circuit court's interpretation is plausible. However, we must construe the statutory exemption narrowly and strictly in favor of taxation. *Swank*, 336 Ill. App. 3d at 856. There is simply nothing in the statute stating that the owner of the property must be the entity that profits for the exemption to be inapplicable. We are therefore persuaded by the Department's interpretation that the phrase "used with a view to profit" refers to any entity profiting from the use of the property, not just the owner of the property. This interpretation

follows the mandate that tax-exemption provisions be construed narrowly, and it gives the appropriate deference to the Department's application of the statute. See *id.* at 859 (citing *Forest Preserve District of Du Page County v. Department of Revenue*, 266 Ill. App. 3d 264, 270 (1994), and *Abrahamson*, 153 Ill. 2d at 97-98).

¶ 54                                  III. CONCLUSION

¶ 55        For the foregoing reasons, we reverse the circuit court of Cook County's order and affirm the Department's decision that the University and Bright Horizons were not entitled to a tax exemption under section 15-35 of the Code.

¶ 56        Circuit court judgment reversed.

¶ 57        Department decision affirmed.