**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 190543-U

Order filed August 13, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| REINALDO RIVERA, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Will County, Illinois. |
| | ) | |
| v. | ) | Appeal No. 3-19-0543 |
| | ) | Circuit No. 19-MR-716 |
| VILLAGE OF ROMEOVILLE, Division/ | ) | |
| Department of Administrative Hearings, | ) | |
| | ) | Honorable John C. Anderson, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE SCHMIDT delivered the judgment of the court.
Justice Carter concurred with the judgment.
Justice Holdridge, dissented.

**ORDER**

¶ 1     *Held*:  We affirm the determination of the Village of Romeoville's hearing officer.

¶ 2     The Village of Romeoville (Village) declared plaintiff Reinaldo Rivera's dog dangerous pursuant to Village ordinance after an incident with Rivera's neighbors. Rivera requested an administrative hearing to challenge that determination. The hearing officer ruled against Rivera. The circuit court of Will County affirmed the hearing officer's decision. On appeal, Rivera raises

numerous arguments that we address below. For the following reasons, we affirm the judgment of the circuit court upholding the hearing officer's determination.

¶ 3                                     I. BACKGROUND

¶ 4         On January 10, 2019, an incident took place that led to the administrative hearing that we now have the occasion to review. The aforementioned incident revolves around the interactions between a dog named Grizzly and the Fahertys. Ultimately, the interaction turned sour with Mrs. Faherty firing two shots from her .38 Smith & Wessen in the direction of Grizzly. One shot allegedly meant to be a warning shot to scare the dog off, while the other struck the animal resulting in the dog's retreat to Rivera's residence.

¶ 5         Mrs. Faherty went inside her home and dialed 911 to report the incident. Officer Brett Murawski from the Romeoville Police Department arrived shortly thereafter. Murawski detailed the incident in his report after talking to the relevant parties. Subsequently, Rivera received a letter from the Village declaring Grizzly "dangerous" as defined in the Village ordinance.

¶ 6         Rivera filed a notice of appeal and the matter proceeded to a hearing presided over by Village Manager Steve Gulden as the hearing officer.

¶ 7         At the hearing, Sergeant Chris Burne testified. Burne was in charge of the animal control division and responsible for reviewing reports when deciding whether to declare an animal dangerous. He testified as follows. At approximately 8:33 p.m. on January 10, 2019, officers responded to the report of a dog being shot. The call was in response to the following events. Mr. Faherty was outside smoking a cigar in his driveway with his dog on a leash next to him. At some point, Mrs. Faherty, who was inside the residence, heard her husband "start screaming about being attacked by a dog." She retrieved her firearm and exited the home. Once outside, Mrs. Faherty

encountered Grizzly, an approximately 70-pound Pitbull, American Bulldog mix, who she claimed was "acting aggressive and attempting to attack her husband[,]" while on the Fahertys' property.

¶ 8	Grizzly was barking, growling, and charged at her husband. Mr. Faherty stated that he believed if he had attempted to flee, Grizzly would have bitten him. A standoff of sorts ensued over the following several minutes until Omar Zughayar, Rivera's brother, crossed the street and attempted to corral the dog unsuccessfully. Omar then utilized dog treats, more than once, in an attempt to lead Grizzly away from the Fahertys' property. However, once Grizzly reached the end of the trail of treats laid out by Omar, the dog would return to the Fahertys' property and continue the previously described "aggressive behavior." After the "fourth or fifth" iteration of Grizzly leaving the Fahertys' property to consume a trail of treats only to return, Mrs. Faherty fired a warning shot at the ground in front of Grizzly to dissuade the animal from continuing its antics. However, the warning shot was unsuccessful in achieving its purpose. Mrs. Faherty in turn fired another shot, which struck Grizzly resulting in the animal retreating to its owner's residence.

¶ 9	After reviewing the report, comparing it to the dangerous dog ordinance, and conferring with his superior, Burne declared Grizzly a "dangerous dog."

¶ 10	Murawski testified about his discussion with Omar following the incident. Upon coming into contact with Murawski, Omar immediately stated that he was schizophrenic and "that a lot had just happened." Omar admitted that he had left the rear gate open to the residence's backyard and that Grizzly had gotten out through said gate. When Murawski asked about the condition of the dog, Omar responded that Grizzly had a "hole in him" but that the dog was "calm" and on the couch. Murawski never saw the dog as Omar was "reluctant" to allow him to enter the premises. Murawski told Omar to contact Rivera, who was at work, and get Grizzly to a veterinarian.

¶ 11    Following this testimony, the hearing officer asked Burne, Murawski, and Chief of Police Mark Turvey if they believed Grizzly met the threshold requirements of a "dangerous dog" as laid out in the ordinance. Burne and Turvey answered in the affirmative, while Murawski gave an answer in the form of positing a hypothetical that matched what is alleged to have happened above and stating that it would meet the threshold required.

¶ 12    Rivera then proceeded to present his case *pro se*. He introduced a statement from Omar memorialized on a sheet of loose-leaf paper. The statement titled "Events of the truth" detailed how Omar had left the back gate open where Grizzly escaped. Grizzly was barking at the neighbors and one of the neighbors was "screaming like a maniac[.]" The neighbor then told Omar to move out of the way of her line of sight of Grizzly or she would shoot. The neighbor then shot Grizzly from across the street. Omar claims the dog did not charge at the Fahertys. What is alleged to be Omar's signature appears at the bottom of the statement.

¶ 13    Rivera also introduced a behavioral assessment of Grizzly conducted after the incident. Vicky Harper, a dog behavioral therapist and master trainer, performed the assessment. After completing the assessment, Harper, in her professional opinion, found that Grizzly was not dangerous. She further believed that the incident was an "unfortunate accident" and Grizzly should not be deemed "dangerous" for merely getting loose from the Rivera's property and barking at the neighbors.

¶ 14    Rivera went on to argue that aside from Grizzly not actually being dangerous, Mr. Faherty was not acting "peacefully and lawfully" as laid out in the ordinance. Specifically, that when Mr. Faherty yelled "[g]et that f'ing dog out of here or I'm going to shoot it[,]" he was not acting peacefully or lawfully. Rivera believed that the screaming by the Fahertys caused Grizzly to "start barking and all that[.]" When the hearing officer questioned Rivera on this claim, Rivera

acknowledged that Mr. Faherty did not threaten to shoot Grizzly until the dog was already on the Fahertys' property. Rivera further argued that Mrs. Faherty was not acting "peacefully and lawfully" when she discharged her firearm. When asked what the Fahertys did to provoke Grizzly, Rivera acknowledged that all the above complained of behaviors by the Fahertys did not begin until Grizzly was on their property barking.

¶ 15 Rivera admitted that in his conversations with Omar, it was revealed that Grizzly did run on to the Fahertys' property and that the dog was barking at Mr. Faherty. Rivera also acknowledged that Grizzly went back and forth across the street multiple times, only to return to the Fahertys' property. He stated, "Grizzly is a puppy. In all the excitement he was dodging away from my brother. He was excited. He's a baby. When he gets excited, he gets a little wild and he just runs around excitedly, and that's what he was doing, he was running around excitedly." However, Rivera claimed Grizzly never rushed Mr. Faherty or approached within 10 feet of him. Additionally, he alleged that Mrs. Faherty shot Grizzly while the dog was across the street standing in a different neighbor's yard.

¶ 16 Burne then advised the hearing officer that there was a forensic report conducted on the scene of the shooting. The warning shot was recovered from inside one of the neighboring residences. According to Burne, the warning shot hit the ground on the Fahertys' property, crossed the street, and entered a neighbor's home through a basement window where it struck an I-beam. He also claimed that based on the report, officers were able to determine where Grizzly was when shot. Grizzly was shot on the Fahertys' property. The forensic report was not submitted into evidence.

¶ 17 No individual who actually witnessed the incident testified. Neither party lodged an objection during the administrative proceeding.

¶ 18   The hearing officer upheld the dangerous dog determination assigned to Grizzly. In issuing this determination, the hearing officer pointed to the fact that Rivera admitted that the Fahertys did not provoke Grizzly and that "Grizzly's initial actions of approaching Mr. Faherty and his dog while snapping, growling[,] and barking are sufficient to support the conclusion Mr. Faherty and his dog perceived Grizzly as a physical threat." Accordingly, the hearing officer found he was "constrained by the facts" presented during the hearing.

¶ 19   Also pertinent to Rivera's contentions of error on appeal, Mrs. Faherty pled guilty to disorderly conduct for discharging her firearm following the hearing officer's determination in this matter.

¶ 20   Rivera filed a specification of errors with the circuit court requesting administrative review. The contentions of error presented to the circuit court mirror the arguments presented to this court. The circuit court took the matter under advisement and issued a ruling finding that the determination that Grizzly was "dangerous" was "adequately supported by the record."

¶ 21   Rivera appeals.

¶ 22                                II. ANALYSIS

¶ 23   As an initial matter, we must admonish Rivera's counsel due to her failure to comply with Illinois Supreme Court Rule 23 (eff. Apr. 1, 2018). In both Rivera's initial brief and reply brief, counsel cites to a decision from this court published under Rule 23. Rivera's counsel argues she cites the case as an example of the logic she desires this court to adopt in the current matter and "not as precedent." Counsel has succeeded in making a distinction without a difference. Rule 23 is clear, the case cited in Rivera's briefs "may not be cited by any party except to support contentions of double jeopardy, *res judicata*, collateral estoppel or law of the case." Ill. S. Ct. R.

23(e)(1) (eff. Apr. 1, 2018). None of these exceptions apply. As a result, we strike citation to the decision published under Rule 23 from the briefs.

¶ 24    Turning to the merits of Rivera's appeal, he contends that (1) the dangerous dog determination cannot rest solely upon nonwitness hearsay statements of police who were reading statements of third parties from a police report, (2) the determination that Grizzly is a dangerous dog is against the manifest weight of the evidence, (3) the guilty plea Mrs. Faherty entered for disorderly conduct warrants reversal of the dangerous dog determination, and (4) the Village failed to comply with its own ordinances or, in the alternative, failed to provide due process.

¶ 25    In an appeal to the appellate court following administrative review by a circuit court, we review the decision of the administrative agency rather than the circuit court's judgment. *Illinois Landowners Alliance, NFP v. Illinois Commerce Comm'n*, 2017 IL 121302, ¶ 29. When an appellant disputes an administrative agency's factual findings, we apply a manifest weight of the evidence standard. *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 387 (2010). A ruling is against the manifest weight of the evidence only if it is clearly evident from the record that the opposite conclusion should have been reached. *In re C.N.*, 196 Ill. 2d 181, 208 (2001).

¶ 26    We find Rivera's contentions of error unavailing. The Village ordinance defines a dangerous dog in pertinent part as:

> "(1) Any individual dog which behaves in a way that constitutes a physical threat of bodily harm to a person or domestic animal in a place where such person or animal is conducting himself or herself peacefully and lawfully;

(2) Which chases or approaches a person or domestic animal upon a street, sidewalk, or any public grounds in a menacing fashion or apparent attitude of attack; ***." Romeoville Village Ordinance 90.290(B).

¶ 27    Even if we strike the hearsay testimony complained of from the record, Rivera admitted during the hearing that Grizzly approached Mr. Faherty and his dog on the Fahertys' property and began barking. Thereafter, his brother Omar was unable to corral Grizzly while the dog continued to run at large and revisit the Fahertys' property numerous times and exhibit aggressive behavior. This behavior only ceased after Grizzly was on the receiving end of a .38-caliber round from Mrs. Faherty's Smith & Wessen. This alone is sufficient to support a finding that Grizzly is dangerous under the ordinance. Any reasonable person would find that a 70-pound Pitbull mix that wandered onto their property and then began barking at them and their dog constituted a physical threat of bodily harm to their person or their domestic animal. The manifest weight of the evidence supports the dangerous dog determination. Any error below was harmless beyond a reasonable doubt based on Rivera's own admissions. See *Central Illinois Electrical Services, L.L.C. v. Slepian*, 358 Ill. App. 3d 545, 550 (2005) (noting even in the presence of certain errors, "[i]f the outcome of the case would not have been different, a judgment or decree will not be disturbed").

¶ 28    Further, statute bars the consideration of Mrs. Faherty's guilty plea entered on the charge of disorderly conduct. See 735 ILCS 5/3-110 (West 2018) ("No new or additional evidence in support of or in opposition to any finding, order, determination or decision of the administrative agency shall be heard by the court."). Even if we did consider the guilty plea, Mrs. Faherty did not fire the gun until after Grizzly had exhibited behavior sufficient to be classified as dangerous.

¶ 29    Moreover, any error regarding whether the Village complied with its own ordinances in providing a hearing to Rivera was also harmless in light of Rivera's admissions. In the alternative,

- 8 -

Rivera's due process argument centers on the claim that "[h]e was not made aware of all of the witnesses, let alone of his rights to subpoena witnesses or to cross-examine those testifying against him." Nonetheless, even though proceeding *pro se*, we presume Rivera to have knowledge of applicable rules and procedures. *Steinbrecher v. Steinbrecher*, 197 Ill. 2d 514, 528 (2001). Our review of the record does not show that anyone prevented Rivera in any way from objecting to the Village's evidence, subpoenaing witnesses, or cross-examining those who testified.

¶ 30                                    III. CONCLUSION

¶ 31        For the foregoing reasons, we affirm the determination of the Village of Romeoville's hearing officer.

¶ 32        Affirmed.

¶ 33        JUSTICE HOLDRIDGE, dissenting:

¶ 34        The majority finds that, even after striking the hearsay testimony presented at the hearing, Rivera's own admissions support the dangerous dog determination under the ordinance. I disagree.

¶ 35        Rivera admitted that Grizzly was excited, ran onto the neighbor's property, and barked at the neighbors—but Grizzly never rushed the neighbors or approached within 10 feet. He also acknowledged that the neighbor was afraid of Grizzly and started screaming, which he believed was an exaggeration and caused Grizzly to start barking. The majority, in summarizing Rivera's admissions, characterized Grizzly's behavior as "aggressive." *Supra* ¶ 27. At no point did Rivera ever characterize Grizzly's behavior as "aggressive" and his admissions do not support this description. Instead, the neighbors stated that Grizzly was "aggressive" (*supra* ¶¶ 7-8), and the majority indicated it was not considering hearsay testimony complained of from the record. *Supra* ¶ 27. Here, Rivera complained of the nonwitness statements of police who were reading statements

of third parties from a police report, and the Village complained of Grizzly's behavioral assessment conducted by the dog behavioral therapist and master trainer.

¶ 36    Based on the foregoing, it is clearly evident that an opposite conclusion should have been reached. At most, the nonhearsay evidence showed that Grizzly barked at a screaming neighbor, ran onto the neighbors' property getting no closer than 10 feet, and was unable to be corralled. Grizzly's actions in this case sound like how most puppies would behave if able to escape their owner's control—excited and difficult to rail in—especially if a person has its attention by screaming and waving a gun. It is unfortunate that Grizzly escaped from Rivera's residence, but Grizzly's behavior does not rise to the level of dangerous as required by the ordinance. Therefore, I would find the dangerous dog determination to be against the manifest weight of the evidence.